**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JAN 08 2018

JAMES W. McCORMACK, CLERK
By: _____
                          DEP CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | |
|---|---|
| **SARA WYLIE, as Personal Representative of the Probate Estate of Phillip Wylie, Deceased, and as Trustee of the Wylie Revocable Living Trust; and MICHAEL WYLIE as Personal Representative of the Probate Estate of Phillip Wylie, Deceased,** | § § § § § |
| Plaintiffs, | § |
| vs. | § § |
| **PLATINUM EQUITY, LLC; RYERSON HOLDING CORPORATION (f/k/a Rhombus Holding Corporation); and RYERSON INC.,** | § § § § |
| Defendants. | § |

No. _4:18-cv-17- JLH_

This case assigned to District Judge _Holmes_
and to Magistrate Judge _Kearney_

## COMPLAINT AND JURY DEMAND

Plaintiffs complain of Defendants as follows:

### Summary Of The Suit

1.      This case is about how a leveraged buy-out firm used a loyal and dedicated manager of the Southwest Region of the target company to help turn the company around with a promise of participation in the target company's initial public offering, only to terminate the manager shortly before the IPO was finalized, as the former manager gradually died from lymphoma brain cancer.

2.      The deceased former manager was Phillip Wylie, who, with his wife Sara Wylie, had a son, Michael Wylie. The target company was Ryerson Steel. The leveraged buy-out firm that used Phillip Wylie was Platinum Equity. The amount that Platinum Equity cheated from Phil

and his family is $6,562,500. Through this suit, Phillip Wylie's family seeks compensatory and punitive damages for the Defendants' unconscionable conduct, with any punitive damage award assessed by the jury to be donated in Phillip Wylie's name to the American Cancer Society.

**Jurisdiction And Venue**

3.      This Court has diversity jurisdiction under 28 U.S.C. §1332 because this action is between citizens of different States and the amount in controversy exceeds $75,000.

4.      Pursuant to 28 U.S.C. §1391(b)(2), venue is appropriate in this Court because (a) Plaintiffs reside in this Judicial District, and (b) a substantial part of the events giving rise to the claims alleged herein occurred in this Judicial District.

**Parties**

5.      **Plaintiffs.**

5.1.      Plaintiff Sara Wylie ("Mrs. Wylie") is the surviving spouse of Phillip Wylie. Mrs. Wylie is a citizen of Arkansas and a resident of Little Rock, Arkansas. Further, Mrs. Wylie is a Joint Personal Representative of the Probate Estate of Phillip Wylie, Deceased, which is pending in the Circuit Court of Pulaski County, Arkansas, Probate Division, Cause No. 60 PR-17-2536. Mrs. Wylie is also the sole trustee of the Wylie Revocable Living Trust, an Arkansas trust, into which Phillip Wylie transferred all of his assets (including any causes of action) as Phillip Wylie was gradually dying from brain cancer.

5.2.      Plaintiff Michael Wylie is the son of Phillip and Sara Wylie. Michael Wylie is a citizen of Arkansas and a resident of Little Rock, Arkansas. Further, Michael Wylie is a Joint Personal Representative of the Probate Estate of Phillip Wylie, Deceased.

5.3.      Mrs. Wylie and her son, Michael Wylie, as Joint Personal Representatives of the Probate Estate of Phillip Wylie, Deceased, bring this action for recovery of damages caused to Phillip Wylie during his lifetime as authorized by the Illinois Survival of Action

2

Statute, 755 ILCS 5/27-6. In addition, Mrs. Wylie brings action for damages as Trustee of the Wylie Revocable Living Trust.

6.    **Defendants.** All of the Defendants listed below were active participants in, and provided knowing and substantial assistance for, the implementation and successful execution of the wrongful and unconscionable conduct involved in this suit.

6.1.    Defendant Platinum Equity, LLC ("Platinum") is a Delaware limited liability company with its principal place of business in Beverly Hills, California. Platinum is a global leveraged buy-out firm which owns a majority of the common stock of Defendant Ryerson Holding Corporation. At all times relevant to this suit, Platinum (both itself, and through affiliated entities) conducted business in the State of Arkansas on a regular, continuous and systematic basis.

6.2.    Defendant Ryerson Holding Corporation (f/k/a Rhombus Holding Coporation) ("Ryerson Holding") is a Delaware corporation with its principal place of business in Beverly Hills, California. On January 4, 2010, Ryerson Holding changed its name from Rhombus Holding Corporation to Ryerson Holding Corporation. Ryerson Holding is the parent company of Defendant Ryerson Inc., and is a corporate affiliate and/or subsidiary of Defendant Platinum. At all times relevant to this suit, Ryerson Holding (both itself, and through affiliated entities) conducted business in the State of Arkansas on a regular, continuous and systematic basis.

6.3.    Defendant Ryerson Inc. (as the successor in interest to Ryerson Tull, Inc., which was in turn the successor in interest to Joseph T. Ryerson & Son, Inc.) ("Ryerson") is a Delaware corporation with its principal place of business in Chicago, Illinois. Ryerson is a corporate affiliate and/or subsidiary of Defendants Platinum and Ryerson Holding. At all times

3

relevant to this suit, Ryerson maintained corporate offices in the State of Arkansas and conducted business in the State of Arkansas on a regular, continuous and systematic basis.

<u>Facts</u>

A.    <u>Background</u>.

7.    Ryerson is one of the largest processors and distributors of metals in the United States, with global operations throughout North America, China and Brazil. Basically, Ryerson is a steel service center that buys various metals (such as stainless steel, aluminum, carbon steel and alloy steels) in bulk, processes the metals (typically by cutting and bending), and then sells the processed metals to manufacturers of metal products.

8.    Ryerson (originally named Joseph T. Ryerson & Son, Inc.) was founded in Chicago, Illinois in 1842. Initially a privately held company, in October of 2007, Ryerson was acquired by Platinum, a leveraged buy-out firm based out of Beverly Hills, California.

9.    Phillip Wylie started working for Ryerson in Little Rock, Arkansas in the 1970s. During his first stint with the Company, Phil was relocated from Arkansas to California. After a brief time in California (about two years), Phil wanted to move his family back to Arkansas. So, in 1981, Phillip Wylie left Ryerson in California, and began working for AFCO Metals in Little Rock, Arkansas. Phillip Wylie worked for AFCO from 1981 to 1987, when AFCO was purchased by Ryerson.

10.    Now back at Ryerson in Arkansas, Phillip Wylie would eventually rise to the position of President of the Southwest Region of Ryerson (a region which included Arkansas, California, New Mexico, Texas, Oklahoma, Kansas and Louisiana, and, eventually, Mexico). On May 30, 2000, Phillip Wylie signed an Employment Agreement with Ryerson's predecessor in interest, Ryerson Tull, Inc. (Px 1), which was revised and amended on December 17, 2004. (Px

2) Along his career path, Phillip Wylie first became an executive at Ryerson in 2000, and was later, in 2010, appointed as an officer of the Company. Prior to Platinum's termination of Phillip Wylie's employment in January of 2014, Phil had worked for Ryerson and its affiliated entities for nearly 40 years.

## B.   Ryerson Offers Phillip Wylie The Incentive Of Participation In Ryerson's IPO

11.   Platinum acquired Ryerson on October 17, 2007.

12.   The Great Recession hit in the Fall of 2008, and it hit Ryerson particularly hard. The small manufacturers of metal-based products -- Ryerson's core customer base -- drastically reduced their orders, and Ryerson's sales, and profits, plummeted.

13.   To incentivize its key executives to work hard toward turning the Company around, on February 16, 2009, Rhombus Holding Corporation (n/k/a Ryerson Holding Corporation), a subsidiary of Platinum and Ryerson, offered Phillip Wylie, and other key executives at Ryerson, the opportunity to participate in a Ryerson Initial Public Offering of Ryerson's common stock ("IPO") pursuant to an incentive compensation plan titled "Rhombus Holding Corporation 2009 Participation Plan" (Px 3) (the "Participation Plan"). The executive compensation offered to Phillip Wylie through the Participation Plan was in addition to the other employee compensation Phillip Wylie was otherwise entitled to under his employment agreements with the Company.

14.   The stated purpose of the Participation Plan was to provide Phillip Wylie, and other key executives at Ryerson, with "incentive compensation" which was "based upon the award of Performance Units", the value of which "[was] related to the appreciation in value of the Company . . .." (*Id.* ¶1) The Participation Plan was also "intended to benefit the Company by creating incentives for participating key employees", such as Phillip Wylie. (*Id.*)

5

15.     Before any Performance Units were offered to Phillip Wylie, however, Platinum required that Phil take a cut in pay, as well as a reduction in certain employment benefits that previously had been available to him under his employment agreements with Ryerson. Phillip Wylie willingly accepted these reductions in his employment compensation package to support the goal of making Ryerson a stronger performer, with the promise of receiving a financial reward for those sacrifices through his ultimate participation in the impending Ryerson IPO.

16.     Beginning in 2009, Ryerson required Phillip Wylie to travel to Chicago at least a few times every month to provide corporate reports and to attend corporate meetings at Ryerson's headquarters in Chicago. Phillip Wylie willingly did so, in part because of the additional employment compensation that was promised to him when Ryerson eventually conducted its IPO. Accordingly, from 2009 until 2013, Phillip Wylie performed a substantial amount of his work for Ryerson while physically present in the State of Illinois.

17.     Pursuant to a Grant Agreement dated April 7, 2009 (Px 4), Phillip Wylie was awarded 6,562,500 "Performance Units", with a value of $1.00 per Unit, which were all set to mature on October 31, 2011. The Participation Plan, however, was set to expire on February 15, 2014. (Px 3 ¶15)

18.     With the promise of participation in Ryerson's eventual IPO, Phillip Wylie worked especially hard toward improving the financial condition of Ryerson, and was instrumental in improving the financial strength of his primary area of responsibility -- the Southwest Region. He had considerable success with managing acquisitions, and developing the Mexico division of Ryerson, and finally turning the lagging California operations around. In that connection, Phillip Wylie was instrumental in helping Ryerson navigate the early phases of its ongoing transformation, championing Ryerson's expansion into Mexico and the acquisitions of

6

Texas Steel Processing, Inc. and SFI-Gray Steel, which brought additional strength and financial benefits to Ryerson. Phillip Wylie did so with his usual hard work, dedication and pleasant personality, and all the while, he remained a well-liked and well-respected executive of Ryerson. During 2011, however, Platinum decided to replace the president and chief executive officer of Ryerson with their own guy, Michael C. Arnold ("Arnold").

## C.    In July Of 2013, Phillip Wylie Is Diagnosed With Lymphoma Brain Cancer, But Arnold Terminates Phillip Wylie's Employment At Ryerson

19.    By mid-2013, Ryerson, with Phillip Wylie's substantial assistance, had already shown a remarkable improvement in its financial performance. While Ryerson posted a loss of $8,100,000 in 2011, it posted a profit of $127,300,000 for 2013, for a $135,400,000 turnaround in just two years.

20.    On July 17, 2013, Phillip Wylie was diagnosed with lymphoma brain cancer. In mid-July of 2013, Phil became disoriented on a Friday night during dinner, and could not find his way out of a restaurant. That episode prompted Phil's family to force Phil to go to the emergency room in Little Rock the following day, where an MRI revealed a mass in Phil's brain. This prompted Phil's family to seek out cancer treatment for Phil at MD Anderson Hospital in Houston, Texas. While traveling to Houston the following Tuesday, Phil was contacted by Arnold. During that call, Arnold assured both Phil and his wife, Sara, that Phil needed to focus his attention on getting well, and that his position in the Company, as well as his participation in the impending IPO, was secure upon his eventual return to the Company after he recovered from his chemotherapy treatments.

21.    Thereafter, however, Arnold decided to put Phillip Wylie on short-term disability, rather than (as was the prior practice at Ryerson) accord the recovering executive the opportunity

7

to continue working during the period of recovery, to the best the executive could, and for as long as the executive could. Rather than allow Phil the opportunity to continue working during his therapy, Arnold seized upon this unfortunate episode in Phil's life as an opportunity to formulate a plan to terminate Phil's employment at Ryerson, and thereby cut off his ability to participate in the impending IPO.

22.      Phillip Wylie's cancer treatments started on July 25, 2013. Throughout Phil's cancer treatments, Ryerson executives repeatedly made representations to Phil that he should only focus on his health, and that his place at Ryerson (for both his job and participation in the impending IPO) would be waiting for him upon his return to the Company.

23.      In particular, on July 30, 2013, Roger Lindsay, a Human Resources officer at Ryerson, assured Phillip Wylie that the Participation Plan would be amended, and that the new Participation Plan would include Phillip Wylie. As stated by Mr. Lindsay, the Participation Plan, which was otherwise set to expire in February of 2014, would be rewritten to address the new date for the IPO, and that "you [Phillip Wylie] will be included in it." Accordingly, there was mutual assent to the rewriting of the Participation Plan to specifically include Phillip Wylie's participation in the impending Ryerson IPO.

24.      Phillip Wylie was determined to defeat his disease, and after doing so, it was his intent to continue working at Ryerson for at least a few more years, especially until a transaction took place triggering his right to receive the benefits that were promised to him, and that he worked so hard for -- Ryerson's impending IPO.

25.      On September 5, 2013, Phillip Wylie received a medical release from his doctors at MD Anderson Hospital to return to work. Phil then notified Arnold that he was cleared to return to work, and wanted to do so.

26.     Arnold then had Kevin Richardson, the regional manager of the Southeast
Division of Ryerson, contact Phillip Wylie to tell him that Arnold had decided to shut down the
Southwest Region, and that Phil no longer had a position in the Company. Mr. Richardson
assured Phil, however, that he would still be a participant in Ryerson's IPO when it finally
closed.

## D.     Arnold Informs Phillip Wylie That He Would No Longer Be A
Participant In Ryerson's Impending IPO

27.     Although in September of 2013 it appeared as though Phillip Wylie's cancer had
gone into remission, the chances were likely that the cancer would again rear its ugly head in the
not too distant future. On September 20, 2013, Phillip Wylie and his wife, Sara, established the
Wylie Revocable Living Trust, an Arkansas trust (the "Wylie Trust"), as joint trust makers and
joint trustees. Pursuant to the terms of the Wylie Trust, Phillip Wylie conveyed all of his real,
personal and tangible and intangible property (including Phil's causes of action) into the Wylie
Trust before he died. Upon Phillip Wylie's subsequent death on February 19, 2017, Mrs. Wylie
became the sole trustee of the Wylie Trust.

28.     In December of 2013, Arnold presented Phillip Wylie with a General Separation
and Release Agreement (Px 5) (the "Separation Agreement"). At that time, Phil Wylie was still
of the belief that he would still be a participant in the impending IPO. According to the dictates
of Arnold, however, Phillip Wylie's last day as an employee at Ryerson was scheduled for
January 8, 2014.

29.     On January 5, 2014, Arnold called Phillip Wylie and, for the first time, informed
Phil that he would not be a part of the IPO because he was no longer an employee at Ryerson
and, despite the prior assurances, the Participation Plan would not be rewritten to include Phil.
As Arnold informed Phillip Wylie on that date, "it is a Platinum Equity program", it is

9

"discretionary", and "you [Phil] must be an employee to participate [in the IPO]", and Phil would

not be allowed to participate because "you will no longer be an employee of Ryerson." Although

Phil never would have expected the old Ryerson to engage in any such bad faith conduct, under

Platinum, with Arnold at the helm, to the extent that Phillip Wylie was not allowed to participate

in the IPO, there would be more funds of the IPO available for distribution to Arnold and the

other senior officers of Ryerson who were ushered into office at the insistence of Platinum. In

short, under Arnold's scheming and ruthless regime, profits were given priority over honor.

30.    By letter dated January 13, 2014, Phillip Wylie informed Arnold that:

> I have had the time and opportunity to think deeply about my
> career with Ryerson and the previously acquired companies I have
> worked for continuously since December of 1987. This is
> excluding the 13 years with AFCO Metals prior to a service
> interruption that ended in April of 1981.
>
> My reflection started in earnest when you abruptly elected to put
> me on Short Term Disability within a few days of learning that I
> had Lymphoma of the Brain. I was diagnosed on July 17, started
> treatment on July 25 and short term disability was effective on July
> 30.
>
> You may not be aware but there have been instances over the years
> when managers and executives at Ryerson developed what proved
> to be terminal cancer. They were given the opportunity to continue
> working as best they could as long as they could without being
> pushed aside as you were in such a hurry to do to me. Remember
> Mike, you shared information with Sara and me on the phone
> about how well you were treated at Timken when you had a
> serious medical issue? Apparently you didn't see me as worthy of
> such respectful treatment.
>
> You said that I needed to devote all my energy to recovery. In fact
> you had no idea of my work capability. Your actions as I recovered
> proved what you were really interested in.
>
> Roger Lindsay assured Sara and me on July 30 (no doubt at your
> instruction) that the Participation Plan would be rewritten (to
> address an IPO scenario, new dates and so forth) as it expired in
> February 2014 and that "you will be included in it". Your

statement to me on the January 5, 2014 conference call was, quote "it is a Platinum Equity program" it's "discretionary", you "must be an employee to participate and you will no longer be an employee". Tying that statement with your decision to terminate me points to you as the source of the "discretion".

When I phoned you to report that I would make a full recovery (after only two treatments) on September 6 you expressed that was good news and quote "you sure are a tough old goat", but your underlying thought process was in retrospect must have been--l've got to move fast.

To review, on Wednesday Sep 8, Kevin Richardson called me and said he needed to come see me. I pressed Kevin on why and he said you had decided to shut down the Southwest Region and had asked him to come to Little Rock (by the way Mike, I was your direct report, not Kevin's). No real surprise you had Kevin come since you never came to Little Rock to visit me (the January 2012 performance appraisal conversation during the Talent Review meeting) is our only in person one on one conversation other than while picking you up at various airports. This is for the complete period I reported to you.

You did ultimately call me an hour or so before Kevin arrived on Thursday, but of course told me "you are on short term disability, we will speak to you when you return to work". This just confirms the convenience of your choice to put me on Disability avoiding any communication with me while you implemented your scheme.

(Px 6 pp. 1-3)

31.   In Phillip Wylie's January 13, 2014 letter, he went on to inform Arnold:

Regardless of any of this, I've received my written notification of separation from Ryerson effective Jan 8.

It is important that you understand that I am not inclined to sign a release and walk away from the potential benefit of the Participation Plan. I have told you more than once that I intended to continue working for a few more years, especially until a transaction took place triggering a reward under the Plan.

The Plan was put in place several years before your arrival at Ryerson. However I don't dispute your discretion in removing me from my position. Under the circumstances of my track record including success with managing acquisitions, developing Mexico,

11

> finally turning the West around, to name a few, there is no
> justification for your action.
>
> As you must be aware, since the purchase of Ryerson by Platinum
> Equity I (and others) have endured elimination of benefits
> (company provided car and club memberships). I have willingly
> taken these personal financial hits in support of the goal of making
> Ryerson a stronger performer and have looked to receive a
> financial reward for the sacrifices.
>
> Considering my age and health circumstances it is even more
> patently wrong and totally unacceptable to me. Ironically your
> action has come as you are ever closer to taking the company
> public.

(Px 6 pp. 3-4)

32.     On January 23, 2014, Arnold responded to Phillip Wylie's letter, stating:

> It is certainly your choice not to sign the release that was sent to
> you with your notice of separation. Please note, however, that by
> not signing the release, you are forfeiting any payments and other
> benefits that you would otherwise receive under Ryerson's
> severance policy. Please also note that your participation in the
> Ryerson Participation Plan ended as of the effective date of your
> termination (this is true regardless of whether you sign the release).

(Px 7)

33.     Phillip Wylie's employment with Ryerson officially ended on January 8, 2014.

Since the Separation Agreement was never specifically amended to include Phillip Wylie's

vested employment compensation rights to participate in the IPO, Phil did not believe, and it was

not the intention of the parties, that the release provisions of the Separation Agreement were

intended to cover his right to participate in the impending Ryerson IPO. Accordingly, on

February 20, 2014, Phil signed the Separation Agreement so as to allow him to receive continued

medical coverage for his continuing cancer treatments.

34.     Ryerson's long-pending IPO finally closed on August 8, 2014, at which time the

Ryerson stock began trading on the New York Stock Exchange. Even after the IPO, Platinum

12

retained control of Ryerson, with a 66% ownership stake and its management team -- including Arnold -- still in charge. As Arnold had dictated, Phillip Wylie did not receive any compensation for his matured 6,562,000 Performance Units granted to him under the Participation Plan, and all in contravention of the mutual assurances that were provided to Phillip Wylie -- as he was going through chemotherapy -- that the Participation Plan would be rewritten to specifically include Phil.

35.    Phillip Wylie defeated cancer . . ., for a while. The cancer returned in 2016, with Phil eventually dying from lymphoma brain cancer on February 19, 2017. By the time of Phil's death, Arnold had been replaced as president and CEO of Ryerson by a long-standing Ryerson employee, Eddie Lehner. As so kindly stated by the man who replaced Arnold as president and CEO of Ryerson:

> Dear Colleagues,
>
> It is with great sorrow that I share news of Phil Wylie's passing. As Ryerson's former Southwest region president, Phil was a dedicated mentor and leader, serving the company for nearly 40 years with AFCO Metals and later Ryerson before his retirement in 2013.
>
> I had the opportunity to see and spend time with Phil most recently in 2015 in Little Rock with Kevin Richardson and Dan Boone and afterward in conversation by phone. It is with a heavy heart I can say this man will be missed. Phil was as decent and honest as they come in this world. He believed strongly in conducting business with integrity and high character and it showed in the many relationships he cultivated and built throughout his life. Phil was widely respected in the metals industry and was instrumental in helping Ryerson navigate the early phases of its ongoing transformation championing the company's expansion into Mexico and the acquisitions of Texas Steel Processing, Inc. and SFI-Gray Steel.
>
> On top of his legacy at Ryerson, Phil was also a devoted husband and father. He is survived by his wife Sara and two children, Brooke and Michael.

Please join me in keeping Phil and his family in our thoughts as we
honor his life as a husband, father, friend and colleague.

With deepest sympathies,

[*Eddie Lehner*]

President and Chief Executive Officer
Ryerson

(Px 8)

### E.    The Release Provisions Of The Separation Agreement Are Contrary To Public Policy, And Are Unenforceable

36.    The release demanded by Platinum in exchange for Phillip Wylie receiving certain employment related benefits is contrary to public policy, and is unenforceable. Pursuant to §115/9 of the Illinois Wage Payment and Collection Act, "any release . . . required by an employer as a condition to payment shall be a violation of this Act and shall be void." 820 ILCS 115/9. Accordingly, the release provisions of the Separation Agreement are contrary to public policy, and are unenforceable. Moreover, under the unique circumstances of this case, Ryerson is estopped to assert that Phillip Wylie's right to participate in the August 2014 Ryerson IPO is covered by the release provisions within the Separation Agreement.

37.    All conditions precedent to recovery by Plaintiffs have been performed or have occurred.

38.    Plaintiffs reallege all preceding paragraphs as the basis for each of the following Counts.

### Count One
### (Violations Of The Illinois Wage Payment And Collection Act)

39.    At all times relevant to this suit, the Defendants acted as "employers" of Phillip Wylie as defined under §§115/2 & 13 of the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq.* (the "Wage Act").

40.     Phillip Wylie, as an employee of the Defendants as defined under §115/2 of the Wage Act, 820 ILCS 115/2, worked hard for, and was entitled to receive, the promised participation in Ryerson's IPO, which finally closed on August 8, 2014. Phillip Wylie's right to participate in the Ryerson IPO constituted an earned bonus and other compensation owed to Phillip Wylie by Defendants, as Phillip Wylie's employer, pursuant to an agreement between the two parties, and thus constituted "final compensation" as defined in §115/2 of the Wage Act, 820 ILCS 115/2. *See Schultze v. ABN AMRO, Inc.*, 2017 IL App (1st) 162140, ¶¶22-23.

41.     On August 8, 2014, however, the Defendants failed to pay Phillip Wylie his earned bonus and final compensation in the form of Phillip Wylie's vested right to participate in the Ryerson IPO in violation of §115/5 of Wage Act, 820 ILCS 115/5.

42.     The amount of damages owed by Defendants for violations of the Wage Act totals $6,562,500, which was due to be paid to Phillip Wylie on August 8, 2014.

43.     Pursuant to §115/14 of the Wage Act, 820 ILCS 115/14, Defendants are liable to Plaintiffs for the amount of underpayment of final compensation ($6,562,500), and for additional damages in the amount of 2% of the amount of the underpayment of final compensation ($6,562,500) for each month following the date payment should have been made (August 8, 2014) during which such underpayment remains unpaid.

### Count Two
### (Breach Of Fiduciary Duties)

44.     At all times relevant to this suit, all of the Defendants exercised a substantial degree of control over Phillip Wylie as an officer and employee of Ryerson. In addition, in July of 2013, the Defendants encouraged Phillip Wylie to not worry about his employment at Ryerson, or his right to participate in Ryerson's impending IPO, which would all be there waiting for him when he returned to health, and that Phillip Wylie should simply focus all of his time and

15

attention on recovering from the lymphoma brain cancer that had been inflicted upon him. Accordingly, the Defendants owed fiduciary duties to Phillip Wylie.

45.    The Defendants breached the fiduciary duties that they owed to Phillip Wylie by (a) secretly plotting to eliminate Phillip Wylie's job position while he was sick and undergoing chemotherapy for lymphoma brain cancer; (b) secretly plotting to terminate Phillip Wylie's right to participate in Ryerson's impending IPO while he was sick and undergoing chemotherapy for lymphoma brain cancer; (c) terminating Phillip Wylie's employment at Ryerson in bad faith as part of an attempt to cut off Phillip Wylie's vested right to participate in Ryerson's impending IPO; (d) failing (as promised) to amend the Participation Plan to specifically include Phillip Wylie in the impending Ryerson IPO; and (e) requiring Phillip Wylie to sign a release of claims before allowing an executive such as Phillip Wylie to receive Ryerson's usual severance benefits, including continuing health insurance coverage for his cancer treatments.

46.    The course of conduct set forth above constitutes breaches by Defendants of the fiduciary duties that they owed to Phillip Wylie, proximately causing damages to Plaintiffs in the amount of $6,562,500.

47.    In addition, because the wrongful conduct of the Defendants as described above was willful, intentional, and malicious, or with such a high degree of recklessness that the Defendants knew, must have known, or should have known, that harm would likely result to Phillip Wylie, Plaintiffs seek an assessment of punitive damages against the Defendants in an amount not less than three times Plaintiffs' actual damages. Any punitive damage award assessed by the jury, however, will be donated in Phillip Wylie's name to the American Cancer Society.

**Count Three**
**(Promissory Estoppel)**

48.     In July of 2013, the Defendants made unambiguous promises to Phillip Wylie that, while he was recovering from lymphoma brain cancer, the Participation Plan pertaining to Ryerson's impending IPO would be rewritten to include Phillip Wylie's right to participate in the IPO. Thereafter, Phillip Wylie relied on such promises, with his reliance on the Defendants' representations fully expected and foreseeable by the Defendants. Further, Phillip Wylie relied on the above promises to his detriment.

49.     Accordingly, the Defendants are estopped from contending that Phillip Wylie was not a participant in Ryerson's August 8, 2014 IPO, thus entitling Plaintiffs to recover from the Defendants $6,562,500 as the amount of Phillip Wylie's promised benefits under Ryerson's August 8, 2014 IPO.

**Count Four**
**(Quantum Merit)**

50.     The Defendants knew, and fully expected, Phillip Wylie would work extra hard toward improving the financial condition of Ryerson so as to not only increase the value of Ryerson, but also increase the amount of the Ryerson IPO benefits that would be available to Phillip Wylie when Ryerson eventually conducted its IPO. In light of the Participation Plan, the Defendants knew and had reasonable notice that Phillip Wylie expected compensation for the services that he provided.

51.     In connection with the Participation Plan and the promise to Phillip Wylie of his right to participate in Ryerson's impending IPO, (a) Phillip Wylie provided services to the Defendants; (b) those services were not provided gratuitously; (c) the Defendants accepted those services; and (d) Phillip Wylie was not paid for those services.

17

52.     The Defendants' failure to compensate Phillip Wylie for the valuable services he provided proximately caused injury and damages to Plaintiffs in the amount of $6,562,500.

**Count Five**
**(Unjust Enrichment)**

53.     The Defendants knew, and fully expected, Phillip Wylie would work extra hard toward improving the financial condition of Ryerson so as to not only increase the value of Ryerson, but also increase the amount of the Ryerson IPO benefits that would be available to Phillip Wylie when Ryerson eventually conducted its IPO. In light of the Participation Plan, the Defendants knew and had reasonable notice that Phillip Wylie expected compensation for the services that he provided.

54.     In connection with the Participation Plan, the Defendants have unjustly retained a benefit to Phillip Wylie's detriment, and the Defendants' retention of those benefits violates the fundamental principles of justice, equity and good conscience. If allowed to keep the fruits of Phillip Wylie's labor and valuable services, without compensation, Defendants would be unjustly enriched.

55.     The amount of the Defendants' unjust enrichment totals $6,562,500.

**Attorneys' Fees**

56.     As a result of the acts described above, Plaintiffs have employed the undersigned attorneys to prosecute this cause.  Pursuant to §115/14 of the Wage Act, 820 ILCS 115/14, Plaintiffs are entitled to recover reasonable attorneys' fees from the Defendants for trial of this cause, plus additional reasonable attorneys' fees for any further trials, hearings or appeals.

**PRAYER**

Plaintiffs respectfully request:

(1)     that Plaintiffs have judgment against the Defendants, jointly and severally, for an amount not less than the sum of (a) Plaintiffs' actual damages as set forth above; (b) punitive damages in an amount not less than three times Plaintiffs' actual damages for the Defendants' breach of fiduciary duties as alleged in Count Two; (c) pre- and post-judgment interest at the highest lawful rate; and (d) reasonable attorneys' fees; and

(2)     that the Court grant Plaintiffs court costs and such other and further relief to which they may be entitled.

## JURY DEMAND

Plaintiffs request a trial by jury.

## NOTICE TO DEFENDANTS TO PRESERVE ALL
## DOCUMENTS AND ELECTRONIC STORAGE OF INFORMATION

You are hereby put on notice that you should preserve and not destroy, or allow the destruction of or removal from your files, any documents or electronic storage of information which may, directly or indirectly, have any relevance or bearing on any of the facts, matters or issues set forth in the above Complaint, or may reasonably lead to discovery of the facts, matters or issues which may be relevant to the facts, matters or issues set forth in the above Complaint.

Respectfully submitted,

DATED: January 8th, 2018.

JACK N. BOYD, JR.
JONATHAN R. PRAZAK

BOYD PRAZAK, LLP
2301 Moores Lane
Texarkana, Texas 75503
(903) 838-6123 (telephone)
(903) 832-8489 (facsimile)
jprazak@boydprazak.com

By: _____

JONATHAN R. PRAZAK
Ar. Bar No. 2010273

ARMSTRONG LAW FIRM PC
23353 S. 88th Avenue
Frankfort, IL 60423
(815) 464-3243 (telephone)
(815) 464-3449 (facsimile)
armstronglaw@sbcglobal.net

By: *F. Dean Armstrong with Permission / JRP*

F. DEAN ARMSTRONG
*Pro Hac Vice* pending

ATTORNEYS FOR PLAINTIFFS

20

# EMPLOYMENT AGREEMENT

THIS AGREEMENT, by and between Ryerson Tull, Inc. (the "Company") and Phillip M. Wylie (the "Executive") effective as of May 16, 2000 (the "Effective Date");

## WITNESSETH THAT:

WHEREAS, the Company desires to appoint Executive to the position of Vice President Ryerson Tull South Region, and Executive desires to accept such appointment; and

WHEREAS, in connection with such appointment, the Company and Executive desire to enter into this Agreement;

NOW, THEREFORE, in consideration of the Executive's appointment as Vice President Ryerson Tull South Region, and for other good and valuable consideration the receipt of which is hereby acknowledged, it is agreed by the Executive and Company as follows:

1.  <u>Duties.</u>  The Executive agrees that while he is employed by the Company, he will devote his full business time, energies and talents to serving as the Vice President Ryerson Tull South Region of the Company and providing services for the Company at the direction of the President Ryerson Tull South Region of the Company. The Executive shall have such duties and responsibilities as may be assigned to him from time to time by the President Ryerson Tull South Region, shall perform all duties assigned to him faithfully and efficiently, subject to the direction of the President Ryerson Tull South Region, and shall have such authorities and powers as are inherent to the undertakings applicable to his position and necessary to carry out the responsibilities and duties required of him hereunder; provided, however, that the Executive shall not be required to perform any duties while he is disabled. Notwithstanding the foregoing or any other provisions of this Agreement, the Executive and the Company understand and agree that the responsibilities and duties of the Executive, in his capacity as Vice President Ryerson Tull South Region of the Company, may change from time to time due to other changes in the nature and structure of the Company's business and that any such changes in the Executive's duties and responsibilities

1



that are consistent with such changes in the Company's business shall not constitute a reduction in the Executive's duties and responsibilities for purposes of this Agreement.

2.    <u>Compensation</u>.    Subject to the terms and conditions of this Agreement, during the Employment Period while the Executive is employed by the Company, the Company shall compensate him for his services as follows:

(A)    The Executive shall receive, for each twelve-consecutive month period beginning on June 26, 2000, and each anniversary thereof, an annual salary of $130,000 (the "Salary"), which Salary shall be payable in substantially equal monthly installments. The Executive's rate of Salary shall be reviewed in July 2001.

(B)    The Executive shall be entitled to receive bonuses from the Company in accordance with the bonus plans of the Company as in effect from time to time. As Vice President Ryerson Tull South Region his target bonus award percentage shall be 24% of base pay.

(C)    Except as otherwise specifically provided to the contrary in this Agreement, the Executive shall be provided with health, welfare and other fringe benefits to the same extent and on the same terms as those benefits are provided by the Company from time to time to the Company's other senior management executives.

(D)    The Executive shall be reimbursed by the Company, on terms and conditions that are substantially similar to those that apply to other similarly situated senior management executives of the Company, for reasonable out-of-pocket expenses for entertainment, travel, meals, lodging and similar items which are consistent with the Company's expense reimbursement policy and actually incurred by the Executive in the promotion of the Company's business.

(E)    The Company shall pay or shall reimburse the Executive for the amount of the monthly lease payment for the automobile that he uses for business; provided, however, that the Company shall report as income to the Executive

2

any amounts required by law or the policies of the Company relating to the Executive's personal use of such automobile.

(F)     The Company shall pay or shall reimburse the Executive for his monthly country club dues and assessments; provided, however, that such payment or reimbursement, as applicable, shall apply only to one club at any given point in time.

(G)     The Executive shall be recommended for stock options and performance awards in the same manner as may be in effect from time to time for other similarly situated vice presidents.

3.     **Rights and Payments Upon Termination.**  The Executive's right to benefits and payments, if any, for periods after the date on which his employment with the Company terminates for any reason (his "Termination Date") shall be determined in accordance with this Section 3:

(A)     **Termination by the Company for Reasons Other Than Cause; Termination by the Executive for Good Reason.**  If the Executive's termination by the Company occurs for any reason other than Cause or is a result of the Executive's termination of employment for Good Reason (and is not on account of the Executive's death, disability, or voluntary resignation, the mutual agreement of the parties or any other reason), then the Executive shall receive from the Company for the period commencing on his Termination Date and ending on the earliest of (i) the twelfth month after the Executive's Termination Date; (ii) the date on which the Executive violates the provisions of Sections 4, 5 or 6 of this Agreement; or (iii) the date of the Executive's death, the salary, bonus  and benefits in effect as of his Termination Date.   The monthly salary amounts will continue as described above.  Benefits that will continue will include medical, dental, basic life insurance, any optional life insurance and any optional accidental death and dismemberment insurance.  Bonus shall mean one payment of the average annual amount of the award paid to the Executive pursuant to the annual incentive plan or successor plan with respect to the three years

3

immediately preceding that in which the Termination Date occurs.

Base salary payments to the Executive during the aforementioned twelve month period shall not preclude the Executive's eligibility for payments under the Company's severance plan.

(B)    **Termination By Company for Cause.**  If the Executive's termination is a result of the Company's termination of the Executive's employment on account of Cause, then, except as agreed in writing between the Executive and the Company, the Executive shall have no right to future payments or benefits under this Agreement (and the Company shall have no obligation to make any such future payments or provide any such future benefits) for periods after the Executive's Termination Date.

(C)    **Termination for Death or Disability.**  If the Executive's termination is caused by the Executive's death or permanent disability, then the Executive (or in the event of his death, his estate) shall be entitled to continuing payments of his Salary for the period commencing on his Termination Date and ending on the earlier of (i) the last day of the calendar month in which his Termination Date occurs or (ii) the date on which the Executive violates the provisions of Sections 4, 5 or 6 of this Agreement.

(D)    **Termination for Voluntary Resignation, Mutual Agreement or Other Reasons.**  If the Executive's termination occurs on account of his voluntary resignation, mutual agreement of the parties, or any reason other than those specified in Paragraphs (A), (B) or (C) above then, except as agreed in writing between the Executive and the Company, the Executive shall have no right to future payments or benefits under this Agreement (and the Company shall have no obligation to make any such future payments or provide any such future benefits) for periods after the Executive's Termination Date.  The Executive's termination of employment for Good Reason shall not be treated as a voluntary resignation for purposes of this Agreement.

(E)    **Definitions.**  For purposes of this Agreement:

4

(i)    The term "Cause" shall mean:

    (a)    the continuous failure by the Executive to substantially perform his duties under this Agreement over a normal business cycle in a manner that is inconsistent with past, acceptable performance or in a way that has a demonstrable negative impact on business results as determined by the President Ryerson Tull South Region; or

    (b)    the willful engaging by the Executive in conduct which is demonstrably and materially injurious to the Company or its affiliates, monetarily or otherwise, as determined by the President Ryerson Tull South Region; or

    (c)    conduct by the Executive that involves theft, fraud or dishonesty; or

    (d)    the Executive's violation of the provisions of Sections 4, 5 or 6 hereof.

(ii)   The term "Good Reason" means (a) the assignment to the Executive duties which are materially inconsistent with his duties as Vice President Ryerson Tull South Region of the Company, including, without limitation, a material diminution or reduction in his title, office or responsibilities or a reduction in his rate of Salary, or (b) the involuntary relocation of the Executive to a location that is not within the Little Rock, AR Metropolitan area.

Notwithstanding any other provision of this Agreement, the Executive shall automatically cease to be an employee of the Company and its affiliates as of his Termination Date and, to the extent permitted by applicable law, any and all monies that the Executive owes to the Company shall be repaid before any post-termination payments are made pursuant to the Executive pursuant to this Agreement.

5

4.  **Confidential Information**. The Executive agrees that:

(A)  Except as may be required by the lawful order of a court or agency of competent jurisdiction, or except to the extent that the Executive has express authorization from the Company, he shall keep secret and confidential indefinitely all non-public information (including, without limitation, information regarding litigation and pending litigation) concerning the Company and its affiliates which was acquired by or disclosed to the Executive during the course of his employment with the Company, and not to disclose the same, either directly or indirectly, to any other person, firm, or business entity, or to use it in any way.

(B)  Upon his Termination Date or at the Company's earlier request, he will promptly return to the Company any and all records, documents, physical property, information, computer disks or other materials relating to the business of the Company and its affiliates obtained by him during his course of employment with the Company.

(C)  The Executive shall keep the Company informed of, and shall execute such assignments as may be necessary to transfer to the Company or its affiliates the benefits of, any inventions, discoveries, improvements, trade secrets, developments, processes, and procedures made by the Executive, in whole or in part, or conceived by the Executive either alone or with others, which result from any work which the Executive may do for or at the request of the Company, whether or not conceived by the Executive while on holiday, on vacation, or off the premises of the Company, including such of the foregoing items conceived during the course of employment which are developed or perfected after the Executive's termination of employment. The Executive shall assist the Company or other nominated by it, to obtain patents, trademarks and service marks and the Executive agrees to execute all documents and to take all other actions which are necessary or appropriate to secure to the Company and its affiliates the benefits thereof. Such patents, trademarks and service marks shall become the property of the Company and

6

its affiliates. The Executive shall deliver to the Company all sketches, drawings, models, figures, plans, outlines, descriptions or other information with respect thereto.

(D) To the extent that any court or agency seeks to have the Executive disclose confidential information, he shall promptly inform the Company, and he shall take such reasonable steps to prevent disclosure of Confidential Information until the Company has been informed of such requested disclosure. To the extent that the Executive obtains information on behalf of the Company or any of its affiliates that may be subject to attorney-client privilege as to the Company's attorneys, the Executive shall take reasonable steps to maintain the confidentiality of such information and to preserve such privilege.

(E) Nothing in the foregoing provisions of this Section 4 shall be construed so as to prevent the Executive from using, in connection with his employment for himself or an employer other than the Company or any of its affiliates, knowledge which was acquired by him during the course of his employment with the Company and its affiliates, and which is generally known to persons of his experience in other companies in the same industry.

5.    Nonsolicitation. While the Executive is employed by the Company and its affiliates and for a period of one year after the date the Executive's employment terminates with the Company and its affiliates for any reason, the Executive covenants and agrees that he will not, whether for himself or for any other person, business, partnership, association, firm, company or corporation, directly or indirectly, call upon, solicit, divert or take away or attempt to solicit, divert or take away, any of the customers or employees of the Company or its affiliates in existence from time to time during his employment with the Company and its affiliates.

6.    Noncompetition. While the Executive is employed by the Company and its affiliates, and for a period of one year after the date the Executive's employment terminates with the Company and its affiliates for any reason, the Executive covenants and agrees that he will not, directly or indirectly, engage in, assist, perform services for, plan for, establish or open, or have any financial interest (other than (i) ownership of 1% or less of the

7

outstanding stock of any corporation listed on the New York or American Stock Exchange or included in the National Association of Securities Dealers Automated Quotation System or (ii) ownership of securities in any entity affiliated with the Company) in any person, firm, corporation, or business entity (whether as an employee, officer, director or consultant) that engages in an activity in any state in which the Company or its affiliates is conducting or has reasonable expectations of commencing business activities at the date of the Executive's termination of employment, which is the same as, similar to, or competitive with the metals service center, processing and distribution business of the Company and its affiliates.

7.   **Equitable Remedies.**  The Executive acknowledges that the Company would be irreparably injured by a violation of Sections 4, 5 and 6 and agrees that the Company, in addition to other remedies available to it for such breach or threatened breach, shall be entitled to a preliminary injunction, temporary restraining order, other equivalent relief, restraining the Executive from any actual or threatened breach of Sections 4, 5 and 6 without any bond or other security being required.

8.   **Defense of Claims.**  The Executive agrees that, during his employment with the Company and after his termination, he will cooperate with the Company and its affiliates in the defense of any claims that may be made against the Company or its affiliates to the extent that such claims may relate to services performed by him for the Company. To the extent travel is required to comply with the requirements of this Section 8, the Company, shall to the extent possible, provide the Executive with notice at least 10 days prior to the date on which such travel would be required and the Company agrees to reimburse the Executive for all of his reasonable actual expenses associated with such travel; provided, however, that if the Company reasonably expects the travel to be extensive or unduly burdensome to the Executive from a financial perspective, the Company may provide to the Executive pre-paid tickets for transportation in connection with such travel.

9.   **Notices.**  Notices provided for in this Agreement shall be in writing and shall be deemed to have been duly received when delivered in person or sent by facsimile transmission, on the first business day after it is sent by air express courier service or on the second business day following deposit in the United States registered or certified mail, return receipt requested, postage prepaid and addressed, in the case of the Company to the following address:

8

Ryerson Tull, Inc.
2621 W. 15th Place
Chicago, IL 60608
Attention: William Korda

or to the Executive:

Phillip M. Wylie
13701 Colonial Glenn Road
Little Rock, AR 72210

or such other address as either party may have furnished to the other in writing in
accordance herewith, except that a notice of change of address shall be effective only upon
actual receipt.

10.    Withholding.    All compensation payable under this Agreement shall be
subject to customary withholding taxes and other employment taxes as required with respect
to compensation paid by a corporation to an employee and the amount of compensation
payable hereunder shall be reduced appropriately to reflect the amount of any required
withholding. The Company shall have no obligation to make any payments to the Executive
or to make the Executive whole for the amount of any required taxes.

11.    Successors.    This Agreement shall be binding on, and inure to the benefit of,
the Company and its successors and assigns and any person acquiring, whether by merger,
reorganization, consolidation, by purchase of assets or otherwise, all or substantially all of
the assets of the Company.

12.    Nonalienation. The interests of the Executive under this Agreement are not
subject to the claims of his creditors, other than the Company, and may not otherwise be
voluntarily or involuntarily assigned, alienated or encumbered.

13.    Waiver of Breach.    The waiver by either the Company or the Executive of
a breach of any provision of this Agreement shall not operate as or be deemed a waiver of
any subsequent breach by either the Company or the Executive.  Continuation of payments

-- 9

hereunder by the Company following a breach by the Executive of any provision of this Agreement shall not preclude the Company from thereafter terminating said payments based upon the same violation.

14. **Severability.** It is mutually agreed and understood by the parties that should any of the agreements and covenants contained herein be determined by any court of competent jurisdiction to be invalid by virtue of being vague or unreasonable, including but not limited to the provisions of Sections 4, 5 and 6, then the parties hereto consent that this Agreement shall be amended retroactive to the date of its execution to include the terms and conditions said court deems to be reasonable and in conformity with the original intent of the parties and the parties hereto consent that under such circumstances, said court shall have the power and authority to determine what is reasonable and in conformity with the original intent of the parties to the extent that said covenants and/or agreements are enforceable.

15. **Applicable Law.** This Agreement shall be construed in accordance with the laws of the State of Illinois.

16. **Amendment.** This Agreement may be amended or cancelled by mutual Agreement of the parties in writing without the consent of any other person.

17. **Counterparts.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument. Each counterpart may consist of a copy hereof containing multiple signature pages, each signed by one party hereto, but together signed by both of the parties hereto.

18. **Other Agreements.** This Agreement constitutes the sole and complete Agreement between the Company and the Executive and supersedes all other agreements, both oral and written, between the Company and the Executive with respect to the matters contained herein; provided, however, that this Agreement does not supersede any Change in Control Agreement or Severance Plan. No verbal or other statements, inducements, or representations have been made to or relied upon by the Executive. The parties have read and understand this Agreement.

10

RYERSON TULL, INC.

Dated: 5/22/2000

William Korda
Vice President Human Resources

Dated: 5/30/00

Phillip M. Wylie
Vice President Ryerson Tull South Region

12|16|04



**Ryerson Tull**

Interoffice Communication

December 16, 2004

**CONFIDENTIAL**
Sent Via UPS

From:     W. Korda

To:       S. Makarewicz

Subject:  Revised Employment Agreement – Phil Wylie

Enclosed are two copies of the above-referenced revised employment agreement.  I deleted the reference on page 4 that prohibited double dipping on the severance pay plan. Since Phil has the same position, we are agreeable to maintaining the language that appeared in his last employment agreement (July 2000) regarding severance.  (See strikeout copy of page 4).

Have Phil return two signed copies to me as soon as possible for my signature.  I will send him a signed copy for his files.

WK/pw
Attachment



and (b) below, and the denominator of which is the number of whole months in the applicable bonus performance period. The valuation date for purposes of determining the proration factor is:

(a)    the last day of the month preceding the Termination Date if the Termination Date occurs from the 1st through the 15th of the month, and

(b)    the last day of the month in which the Termination Date occurs if the Termination Date occurs from the 16th through the last day of the month.

The percent attainment of the applicable performance measure is not prorated and is determined at the end of the bonus performance period as defined in accordance with the Corporation's Annual Incentive Plan (or successor plan). The final bonus payment is payable in the first quarter of the year following the year in which the Executive's termination occurs.

Annual Base Salary payments to the Executive during the Benefit Period shall not preclude the Executive's eligibility for cash severance payments under the Corporation Severance Plan. provided, however, that any benefit continuation period under this Agreement shall run concurrently with the applicable benefit period under such Severance Plan and thus (i) the Executive shall not be eligible for noncash benefits under the Severance Plan during the Benefit Period, and (ii) cash payments due under the Severance Plan shall be reduced by the amount of cash payments made under this Agreement.

(B)    **Termination By Corporation for Cause**. If the Corporation terminates the Executive's employment for Cause, then except as agreed in writing between the Executive and the Corporation, the Executive shall be entitled to receive only compensation and benefits earned up to the Date of Termination. The Executive shall not be entitled to receive any payments or benefits under this Agreement with respect to the period after the Executive's Termination Date and the Corporation shall have no obligation to make any additional payments or provide any other benefits with respect to the period after the Executive's Termination Date.

(C)    **Termination for Death or Disability**. If the Executive's termination is caused by the Executive's death or permanent disability (as that term is defined under the Corporation's Long Term Disability Plan), then the Executive (or in the event of his or her death, his or her estate) shall be entitled to continued payments of Annual Base Salary for the period commencing on the Termination Date and ending on the earlier of (i) the last day of the calendar month in which his or her Termination Date occurs; (ii) the date on which the Executive violates the provisions of Paragraphs 4, 5 or 6 of this

-4-

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement"), by and between Ryerson Tull, Inc. (the "Corporation") and Phillip M. Wylie (the "Executive") effective as of December 10, 2004 (the "Effective Date").

The Corporation desires to appoint the Executive to the position of Vice President Mid-South Division, and the Executive desires to accept such appointment. In that employment the Executive will be entrusted with knowledge of the Corporation's business and operational methods. The Corporation wishes to protect its business and operational methods through the restrictions and covenants specified herein. The Executive recognizes that the Corporation's business and operational methods require protection, and the Executive is willing to protect the Corporation's business and operational methods through the restrictions and covenants specified herein.

NOW, THEREFORE, the Executive and the Corporation hereby agree as follows.

1.  **Position and Duties.** Effective as of the Effective Date, the Executive will serve as Vice President Mid-South Division and in such capacity shall have such duties and responsibilities as may be assigned to him or her from time to time by the Corporation. The Executive shall have such authorities and powers as are inherent to the undertaking of this position and necessary to carry out these responsibilities and duties. Notwithstanding the foregoing or any other provisions of this Agreement, the Executive and the Corporation understand and agree that the responsibilities and duties of the Executive, in the capacity of Vice President Mid-South Division of the Corporation, may change from time to time due to changes in the nature, structure or needs of the Corporation's business and that any such changes in the Executive's duties and responsibilities that are consistent with such changes in the Corporation's business shall not constitute a reduction or increase in the Executive's duties and responsibilities for purposes of this Agreement.

The Executive shall devote his or her best efforts and full business time and attention (except for permitted vacation periods and reasonable periods of illness or other incapacity) to the business and affairs of the Corporation and its affiliated companies. The Executive shall perform all assigned duties to the best of his or her abilities in a diligent, trustworthy, businesslike and efficient manner.

2.  **Compensation.** Subject to the terms and conditions of this Agreement, while the Executive is employed by the Corporation under this Agreement, the Executive shall be compensated for services as follows:

    (A)  Effective January 3, 2005 the Executive's annual base salary shall be $175,000 ("Annual Base Salary"), payable in bi-weekly installments under the Corporation's general payroll practices, subject to customary withholding.

(B)    The Executive will be eligible for an incentive bonus payment from the Corporation each calendar year or applicable performance period (the "Performance Bonus") in accordance with the Corporation's Annual Incentive Plan (or successor plan) of the Corporation as in effect from time to time.  The Target Bonus Percentage shall be 50% of Annual Base Salary.  The Corporation reserves the right, in its sole discretion, to terminate or modify the Annual Incentive Plan or to change the target bonus percentage.  :

(C)    Except as otherwise specifically provided herein, the Executive shall be provided with health, welfare and other benefits to the same extent and on the same terms as those benefits are provided by the Corporation from time to time to other similarly situated executives of the Corporation.  Nothing in this Agreement precludes the Corporation from amending or terminating any plans or programs generally applicable to salaried employees or executives, as the case may be.

(D)    The Executive shall be reimbursed by the Corporation, on terms and conditions that are applicable to other similarly situated executives of the Corporation, for reasonable out-of-pocket expenses for entertainment, travel, meals, lodging and similar items, consistent with the Corporation's expense reimbursement policy in effect at the time.  Nothing in this Agreement precludes the Corporation from amending or terminating its expense reimbursement policy.

(E)    The Corporation shall pay or shall reimburse the Executive for the amount of the monthly lease payment for the automobile approved by the Corporation for the Executive's business; provided however, that the Corporation shall report as income to the Executive any amounts required by law or the policies of the Corporation for the Executive's personal use of such automobile.

(F)    The Corporation shall pay or shall reimburse the Executive for his monthly dues and assessments at one country club approved by the Corporation.

3.    **Rights and Payments Upon Termination**.  The Executive's right to benefits and payments, if any, for periods after the date the Executive's employment with the Corporation terminates for any reason (the "Termination Date") shall be determined in accordance with this Paragraph 3:

(A)    **(Termination by the Corporation for Reasons Other Than Cause; Termination by the Executive for Good Reason**.  If the Corporation terminates the Executive's employment for reasons other than Cause or as a result of termination by the Executive for Good Reason, then for the period (the "Benefit Period") commencing on the Executive's Termination Date and ending on the earliest of:

-2-

(i)    the twelfth month after the Termination Date (less the period attributable to any pay in lieu of notice in accordance with the final sentence of Paragraph 4 of this Agreement);

(ii)    the date the Executive violates or initiates any legal challenge to the provisions of Paragraphs 4, 5 or 6 of this Agreement; or

(iii)    the date of the Executive's death or the date the Executive is determined to be eligible for benefits under the Corporation's Long Term Disability Plan;

The Executive shall continue to receive from the Corporation bi-weekly payments based on his or her Annual Base Salary, a Bonus (as defined below), and certain other benefits in effect as of the Termination Date.  Benefits provided under the terms of this Paragraph 3(A) are medical and dental coverage only [unless the Executive is eligible for retiree medical benefits on the Termination Date, in which case only dental coverage is offered under this Paragraph 3(A)].  All other benefits shall be terminated on the Termination Date.  To retain eligibility for medical and dental benefit coverage, the Executive must pay premiums equivalent to the amounts required of active employee participants in these benefit plans.

"Bonus" shall mean one payment of the average annual amount of the Performance Bonus paid to the Executive under the Annual Incentive Plan or successor plan for the three or fewer Bonus payments paid to the Executive immediately preceding the year in which the Termination Date occurs.  If the Executive's period of employment with the Corporation is less than one year, the Bonus payment shall be based on the Target bonus Percentage established for the Executive under the Corporation's Annual Incentive Plan (or successor plan).  For purposes of calculating the average annual amount of the Performance Bonus, where no Performance Bonus is paid in any of the three or fewer years preceding the Termination Date used in the calculation described herein, any such year or years will be included in the average calculation as zero.  This bonus payment is payable in the first quarter of the year following the year in which the Executive's termination occurs.

In addition to the Performance Bonus described above, provided that the Executive has not violated any of the provisions of Paragraphs 4, 5 or 6 of this Agreement, the Executive may be entitled to an additional Final Bonus (as defined below) for the year in which the Termination Date occurs.  "Final Bonus" means an amount equal to the product of (1) the Executive's Annual Base Salary multiplied by (2) the most recent Target Bonus Percentage established for the Executive under the Corporation's Annual Incentive Plan (or successor plan); (3) multiplied by the percent attainment of the applicable performance measures, and multiplied by (4) a proration factor which is a fraction, the numerator of which is the number of whole months determined under (a)

-3-

and (b) below, and the denominator of which is the number of whole months in the applicable bonus performance period. The valuation date for purposes of determining the proration factor is:

(a) the last day of the month preceding the Termination Date if the Termination Date occurs from the 1st through the 15th of the month, and

(b) the last day of the month in which the Termination Date occurs if the Termination Date occurs from the 16th through the last day of the month.

The percent attainment of the applicable performance measure is not prorated and is determined at the end of the bonus performance period as defined in accordance with the Corporation's Annual Incentive Plan (or successor plan). The final bonus payment is payable in the first quarter of the year following the year in which the Executive's termination occurs.

Annual Base Salary payments to the Executive during the Benefit Period shall not preclude the Executive's eligibility for cash severance payments under the Corporation Severance Plan.

(B) **Termination By Corporation for Cause**. If the Corporation terminates the Executive's employment for Cause, then except as agreed in writing between the Executive and the Corporation, the Executive shall be entitled to receive only compensation and benefits earned up to the Date of Termination. The Executive shall not be entitled to receive any payments or benefits under this Agreement with respect to the period after the Executive's Termination Date and the Corporation shall have no obligation to make any additional payments or provide any other benefits with respect to the period after the Executive's Termination Date.

(C) **Termination for Death or Disability**. If the Executive's termination is caused by the Executive's death or permanent disability (as that term is defined under the Corporation's Long Term Disability Plan), then the Executive (or in the event of his or her death, his or her estate) shall be entitled to continued payments of Annual Base Salary for the period commencing on the Termination Date and ending on the earlier of (i) the last day of the calendar month in which his or her Termination Date occurs; (ii) the date on which the Executive violates the provisions of Paragraphs 4, 5 or 6 of this Agreement; (iii) the date of the Executive's death; or (iv) the date of the Executive's permanent disability.

(D) **Termination for Voluntary Resignation, Mutual Agreement or Other Reasons**. If the Executive's termination occurs on account of his or her voluntary resignation, mutual agreement of the parties, or any reason other than those specified in Paragraphs (A), (B)

-4-

or (C) above, then, except as agreed in writing between the Executive and the Corporation, the Executive shall not be entitled to receive any payments or benefits under this Agreement with respect to the period after the Executive's Termination Date and the Corporation shall have no obligation to make any additional payments or provide any additional benefits with respect to the period after the Executive's Termination Date. The Executive's termination of employment for Good Reason shall not be treated as a voluntary resignation for purposes of this Agreement.

(E) **Definitions**. For purposes of this Agreement:

    (i)   The term "Cause" shall mean:

        (a)  the continuous performance by the Executive of his or her duties under this Agreement in a manner that is inconsistent with past, acceptable performance or in a way that has a demonstrably negative impact on business results of the Corporation, its subsidiaries or affiliates, as determined by the Corporation in its sole discretion; or

        (b)  the willful engaging by the Executive in conduct which is demonstrably and materially injurious to the Corporation or its affiliates, monetarily or otherwise, as determined by the Corporation in its sole discretion; or

        (c)  conduct by the Executive that involves a material and substantial violation of Corporation Policy, a violation of criminal law, illegal harassment of other employees, theft, fraud or dishonesty; or

        (d)  the Executive's violation of the provisions of Paragraphs 4, 5 or 6 hereof.

    (ii)  The term "Good Reason" means (a) the assignment to the Executive of duties which are materially inconsistent with the Executive's position and duties under this Agreement, including, without limitation, a material diminution or reduction in title, office or responsibilities or a reduction in Annual Base Salary, if such assignment is not changed by the Corporation, after written notice by the Executive to the Corporation of such diminution or reduction giving the Corporation reasonable opportunity to cure, or (b) the involuntary relocation of the Executive to a location that is not within the Little Rock metropolitan area. Notwithstanding the foregoing, nothing herein shall limit the ability of the Corporation to change the job duties of the Executive consistent with Paragraph 1 of this Agreement.

Notwithstanding any other provision of this Agreement, the Executive shall automatically cease to be an employee of the Corporation and its affiliates as of his or her Termination Date and, to the extent

-5-

permitted by applicable law, any and all monies that the Executive owes to the Corporation shall be repaid before any post-termination payments are made to the Executive under this Agreement.

4. **Termination by Executive or Corporation with Notice.** Subject to the payment obligations and rights set forth in Paragraph 3 above, the Corporation and the Executive agree that either party may terminate the Executive's employment under this Agreement for any or no reason. Each party is obligated to give the other thirty (30) days written notice (the "Notice Period") before terminating the Executive's employment relationship, except that no such notice shall be required in the case of the death of the Executive or the Corporation's termination of the Executive's employment for Cause or if the Corporation and the Executive otherwise agree in writing.

During the Notice Period, the Executive shall (i) meet with the President RT South or his or her designee to wind up any pending work and provide an orderly transfer to other employees of the duties, responsibilities, accounts, customers and clients for which the Executive has been responsible; (ii) work with the Corporation to identify key Confidential Information (as defined in Paragraph 5 below) likely to be in the Executive's possession and provide it to the Corporation as instructed; (iii) disclose and discuss the Executive's future employment plans in light of the Executive's obligations under this Agreement; (iv) deliver to the Corporation all property belonging to the Corporation, including any duplicates, copies or abstracts thereof; and (v) devote full time and attention to these obligations and the Executive's other responsibilities as directed by the Corporation. Notwithstanding the foregoing, the Corporation may, in its sole discretion, terminate the duties of the Executive at any time during the Notice Period providing that the Corporation continues to pay the Executive any Base Salary that may be due to the Executive for any portion of such thirty (30) days Notice Period remaining after the Corporation terminates the duties of the Executive.

5. **Confidentiality and Ownership.** The Executive acknowledges and agrees that the Confidential Information (as defined in Paragraph 5(A) below) is the property of the Corporation, its subsidiaries and affiliates. Accordingly, the Executive agrees as follows:

(A) **Confidential Information.** Except as may be required by applicable law or the lawful order of a court or regulatory body, or except to the extent that the Executive has express authorization in writing from the Corporation to do otherwise, the Executive will keep secret and confidential, during the Executive's employment and at all times thereafter, all Confidential Information and not disclose such Confidential Information, either directly or indirectly, to any other person, firm or business entity, or to use it in any way. For purposes of this Agreement, "Confidential Information" means all non-public information, observations or data relating to the Corporation, its subsidiaries or affiliates, its customers and/or vendors and suppliers, which the Executive has learned or will learn during his or her employment with the Corporation, its subsidiaries or affiliates, whether or not a trade secret within the meaning of applicable law, including but not limited to: (i) new products and new product development; (ii) marketing strategies and plans,

-6-

market experience with products, and market research; (iii) manufacturing processes, technologies and production plans and methods; (iv) formulas, research in progress and unpublished manuals or know how, devices, methods, techniques, processes and inventions; (v) regulatory filings and communications; (vi) identity of and relationship with licensees, licensors or suppliers; (vi) finances, financial information, and financial management systems; (vii) technological and engineering data; (viii) identities of and information concerning customers, vendors and suppliers and prospective customers, vendors and suppliers; (ix) development, expansion and business strategies, pricing strategies, plans and techniques; (x) computer programs; (xi) research and development activities; (xii) litigation and pending litigation; (xiii) personnel information; and (xiv) any other information or documents which the Executive is told or reasonably ought to know the Corporation, its subsidiaries or affiliates regard as proprietary or confidential.

(B) Upon the Executive's Termination Date or at the Corporation's earlier request, the Executive will promptly return to the Corporation any and all records, documents, data, memoranda, reports, physical property, information, computer disks, tapes or software or other materials, and all copies thereof, relating to the business of the Corporation and its subsidiaries and affiliates obtained by the Executive during his or her employment with the Corporation, its subsidiaries or affiliates. The Executive further agrees to deliver to the Corporation, at its request, any computer in the Executive's possession or control which has contained any Confidential Information for the purpose of ensuring that all Confidential Information stored on the computer has been delivered to the Corporation.

(C) The Executive agrees that all inventions, innovations, discoveries, improvements, developments, trade secrets, processes, procedures, methods, designs, analyses, drawings, reports, and all similar or related information which relates to the Corporation's or any of its subsidiaries' or affiliates' actual or anticipated business, research and development or existing or future products or services and which are conceived, developed or made by the Executive while employed by the Corporation or its subsidiaries or affiliates ("Work Product") belong to the Corporation or such subsidiary or affiliate. The Executive shall promptly inform the Corporation of such Work Product, and shall execute such assignments as may be necessary to transfer to the Corporation or its affiliates the benefits of the Work Product, in whole or in part, or conceived by the Executive either alone or with others, which result from any work which the Executive may do for or at the request of the Corporation, whether or not conceived by the Executive while the Executive's non-work time or off the premises of the Corporation, including such of the foregoing items conceived during the course of employment which are developed or perfected after the Executive's Termination Date. The Executive shall assist the Corporation or its nominee, to obtain patents, trademarks and service marks and the Executive agrees to execute all documents and to take all other actions which are necessary or appropriate to secure to the Corporation and its subsidiaries and affiliates

-7-

the benefits thereof. Such patents, trademarks and service marks shall become the property of the Corporation and its affiliates. The Executive shall deliver to the Corporation all sketches, drawings, models, figures, plans, outlines, descriptions or other information with respect thereto.

(D)  To the extent that any court or agency seeks to have the Executive disclose Confidential Information, the Executive shall immediately inform the Corporation, and the Executive shall take such reasonable steps to prevent disclosure of Confidential Information until the Corporation has been informed of such requested disclosure. To the extent that the Executive obtains information on behalf of the Corporation or any of its affiliates that may be subject to attorney-client privilege as to the Corporation's attorneys, the Executive shall take reasonable steps to maintain the confidentiality of such information and to preserve such privilege.

(E)  Nothing in the foregoing provisions of this Paragraph 5 shall be construed so as to prevent the Executive from using, after the Executive's termination of employment with the Corporation, in connection with his or her employment for himself or an employer other than the Corporation or any of its affiliates, knowledge which was acquired by him or her during the course of his or her employment with the Corporation and its affiliates, and which is generally known to persons of his or her experience in other companies in the same industry.

6.  **Noncompetition/Nonsolicitation.** The Executive acknowledges that the industry in which the Corporation is engaged is an international business which is highly competitive and that the Executive is a key executive of the Corporation. The Executive further acknowledges that as a result of his or her senior position within the Corporation, he or she has acquired and will acquire extensive Confidential Information and knowledge of the Corporation's business and the industry in which it operates and will develop relationships with and knowledge of customers, employees, vendors and suppliers of the Corporation and its subsidiaries and affiliates. Accordingly, the Executive agrees that during the time the Executive is employed by the Corporation, its subsidiaries or affiliates (the "Employment Period") and for a period of 12 (twelve) months after the Termination Date (the "Restricted Period"):

(A)  The Executive will not directly or indirectly, own, operate, manage, control, participate, consult with, advise, or have any financial interest in  (whether for himself or for any other person and whether as proprietor, principal, stockholder, partner, agent, director, officer, employee, consultant, independent contractor or in any other capacity), any Competitor of the Corporation, or in any manner engage in the start-up of a business (including by himself or in association with any person, firm, corporate or other business organization through any other entity) in competition with the Corporation's , business provided that this shall not prevent the Executive from ownership of 1% or less of the

-8-

outstanding stock of any corporation listed on the New York or American Stock Exchange or included in the National Association of Securities Dealers Automated Quotation System or ownership of securities in any entity affiliated with the Corporation. "Competitor" refers to a person or entity, including metals-related Internet marketplaces, engaged in the metal service center processing and/or distribution business.

(B)  The Executive will not directly or indirectly contact, call upon, solicit business from, or sell any products sold or distributed by the Corporation to any customer or prospective customer of the Corporation with whom employees of the Corporation had contact during the Employment Period.

(C)  The Executive will not directly or indirectly either alone or in cooperation with others, encourage any employees of the Corporation to seek or accept an employment or business relationship with a person or entity other than the Corporation, or in any way interfere with the relationship of the Corporation and any subsidiary or affiliate and any employee thereof, including without limitation, to hire, solicit for hire, or discuss or encourage the employment of, any of the employees of the Corporation who were employed by the Corporation during the Employment Period; provided however, this shall not apply to an employee whose employment was terminated by the Corporation before the Termination Date, if such termination was not caused by any direct or indirect involvement of the Executive or a subsequent employer of the Executive.

(D)  The Executive will not directly or indirectly either alone or in cooperation with others, encourage any supplier, distributor, franchisee, licensee, or other business relation of the Corporation, any subsidiary or affiliate of the Corporation to cease or curtail doing business with the Corporation, any subsidiary or affiliate of the Corporation, or in any way interfere with the relationship between any such customer, supplier, distributor, franchisee, licensee or business relation and the Corporation or subsidiary or affiliate.

If any restriction set forth in this Agreement is determined by a court of competent jurisdiction to be unreasonable or unenforceable with respect to scope, time, geographical, customer or other coverage under circumstances then existing, the parties agree that (a) the maximum duration, scope or area reasonable under such circumstances shall be substituted for the stated duration, scope or area and that the court shall be allowed to revise the restrictions contained herein to cover the maximum period, scope and area permitted by law, so as to provide the maximum legally enforceable protection of the Corporation's interests as described in this Agreement, without negating or impairing any other restrictions or agreements set forth herein, and (b) the Benefit Period shall be reduced so as not to exceed any revised Restricted Period.

7.  **No Conflict.**  The Executive represents that the Executive is not a party to any agreement with any third party containing a non-competition provision, non-solicitation provision, confidentiality

-9-

provision or any other restriction that would prohibit or restrict the Executive's employment with the Corporation or any part of the services which the Executive provides to the Corporation or its clients. Moreover, the Executive represents that the Executive is not limited by any court order or other legal obligation from performing any assigned duties for the Corporation and that the Executive has no rights which may conflict with the interests of the Corporation or with the Executive's obligations hereunder. The Executive represents that the Executive does not possess any documents or material containing confidential information from any prior employer and, to the extent the Executive knows or possesses any such confidential information, the Executive agrees not to disclose it to the Corporation. Finally, the Executive states that he/she has disclosed to the Corporation all prior confidentiality, non-solicitation and non-compete agreements which he has entered into with his prior employers.

    8.    **Change of Title, Duties**. The Executive agrees that if, at any time, the Executive's title or duties is changed by the Corporation consistent with Paragraph 1 of this Agreement, the Executive nevertheless will continue to be bound in all particulars to the terms and conditions of this Agreement.

    9.    **Validity**. If any one or more of the provisions contained in the Agreement shall, for any reason, be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Agreement, and this Agreement shall be constructed as if such invalid, illegal, or unenforceable provision had never been contained herein.

    10.    Reasonableness of Restrictions/Injunctive Relief.

    (A)    The Executive acknowledges that his or her rights to compete and disclose Confidential Information and trade secrets are limited hereby only to the extent necessary to protect the Corporation against unfair competition and that, in the event the Executive's employment with the Corporation terminates for any reason, the Executive will be able to earn a livelihood without violating the foregoing restrictions. The Executive acknowledges that the restrictions cited herein are reasonable and necessary for the protection of the Corporation's legitimate business interests.

    (B)    The Executive acknowledges that the services to be rendered by the Executive as the Vice President Mid-South Division are of a special, unique and extraordinary character and, in connection with such services, the Executive will, by virtue of his/her senior position with the Corporation, have access to confidential information vital to the Corporation's business. The Executive consents and agrees that if the Executive violates any of the provisions of this Agreement, the Corporation would sustain irreparable harm and, therefore, in addition to any other remedies which the Corporation may have under this Agreement or otherwise, the Corporation shall be entitled to an injunction from any court of competent jurisdiction restraining the Executive from committing or continuing any such violation of this Agreement, including, without limitation, restraining the Executive from disclosing, using for any purpose, selling, transferring or otherwise

-10-

disposing of, in whole or in part, any trade secrets, Confidential Information, proprietary information, client or customer lists or other information pertaining to the financial condition, business, manner of operation, affairs, plans or prospects of the Corporation. The Executive acknowledges that damages at law would not be an adequate remedy for violation of this Agreement, and the Executive therefore agrees that the provisions may be specifically enforced against the Executive in any court of competent jurisdiction. Nothing contained herein shall be construed as prohibiting the Corporation from pursuing any other remedies available to it for such breach or threatened breach, including the recovery of damages.

(C)  The parties agree that money damages would be inadequate for any breaches of Paragraphs 4, 5 and 6 of this Agreement. Therefore, in the event of a breach or threatened breach of Paragraphs 4, 5 or 6, the Corporation, or its successors or assigns may, in addition to other rights and remedies existing in its favor, apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief, to enforce, or prevent any violation of, the provisions hereof (without posting a bond or other security).

(D)  The Executive agrees that: (i) the covenants set forth in Paragraph 6 are reasonable, (ii) the Corporation would not have entered into this Agreement but for the covenants of the Executive contained in Paragraph 6, and (iii) the covenants contained in Paragraph 6 have been made in order to induce the Corporation to enter into this Agreement.

11.  **Successors and Assigns.**  This Agreement shall be binding on, and inure to the benefit of, the Corporation and its successors and assigns and any person acquiring, whether by merger, reorganization, consolidation, or by purchase of all or substantially all of the assets of the Corporation. The Executive agrees that the Corporation may assign its rights and obligations under this Agreement. This Agreement shall be binding upon the Executive, without regard to the duration of his employment by the Corporation or reasons for the cessation of such employment, and inure to the benefit of his administrators, executors, and heirs, although the obligations of the Executive are personal and may be performed only by the Executive. The interests of the Executive under this Agreement may not be voluntarily assigned, alienated or encumbered by the Executive or his successors in interest, and any attempt to do so shall be void and of no effect.

12.  **Notification.**  The Executive shall notify all future employers of the existence of Paragraphs 4, 5, 6, 9, 10, 17 and 18 of this Agreement and the terms thereof. The Executive will also provide the Corporation with information the Corporation may from time to time request to determine the Executive's compliance with the terms of this Agreement. The Executive hereby authorizes the Corporation to contact the Executive's future employers and other parties with whom the Executive has engaged or may engage in any business relationship to determine the Executive's compliance with this Agreement and to communicate the contents of this Agreement to such employers and parties.

13. **Cooperation in Certain Matters**. The Executive agrees that, during the Employment Period and after the Termination Date, the Executive will cooperate with the Corporation in any current or future or potential legal, business, or other matters in any reasonable manner as the Corporation may request, including but not limited to meeting with and fully answering the questions of the Corporation or its representatives or agents, and in any legal matter testifying and preparing to testify at any deposition or trial. The Corporation agrees to compensate the Executive for any reasonable expenses incurred as a result of such cooperation.

14. **Captions**. The captions of this Agreement are not part of the provisions hereof and shall have no force or effect.

15. **No Mitigation**. In no event shall the Executive be obligated to seek other employment or take any other action by way of mitigation of the amounts payable to the Executive under any of the provisions of this Agreement and, except as specifically provided in Paragraph 3(A) hereof, the amount of any payment or benefit provided for in this Agreement shall not be reduced by any compensation or benefits earned by the Executive as the result of employment by another employer.

16. **Counterparts**. This Agreement may be executed in several counterparts, each of which shall be deemed an original but which together shall constitute one and the same instrument.

17. **Governing Law**. In the event of any dispute arising under this Agreement, it is agreed that the law of the State of Illinois shall govern the interpretation, validity, and effect of this Agreement without regard to the place of performance or execution thereof.

18. **Enforcement**. The Corporation and the Executive hereby submit to the jurisdiction and venue of any state or federal court located within Cook County, Illinois for resolution of any and all claims, causes of action or disputes arising out of, related to or concerning this Agreement and agree that services by registered mail to the addresses set forth below shall constitute sufficient service of process for any such action. The parties further agree that venue for all disputes between them, including those related to this Agreement, shall be with a state or federal court located within Cook County, Illinois. If the Corporation is required to seek enforcement of any of the provisions of this Agreement, the Corporation will be entitled to recover from the Executive its reasonable attorneys' fees plus costs and expenses as to any issues on which it prevails.

19. **Notices**. Notices provided for in this Agreement shall be in writing and shall be deemed to have been duly received when delivered in person or sent by facsimile transmission, on the first business day after it is sent by air express courier service or on the third business day following deposit in the United States registered or certified mail, return receipt requested, postage prepaid and addressed, in the case of the Corporation to the following address:

-12-

Ryerson Tull, Inc.
2621 W. 15th Place
Chicago, IL  60608
Attention:  William Korda

or to the Executive:

Phillip M. Wylie
13701 Colonel Glenn
Little Rock, AR  72210

or such other address as either party may have furnished to the other in writing in accordance herewith, except that a notice of change of address shall be effective only upon actual receipt.

20.  **Waiver of Breach**.  The waiver by either the Corporation or the Executive of a breach of any provision of this Agreement shall not operate as or be deemed a waiver of any subsequent breach by either the Corporation or the Executive.  Continuation of payments hereunder by the Corporation following a breach by the Executive of any provision of this Agreement shall not preclude the Corporation from thereafter terminating said payments based upon the same violation.

21.  **Survival of Agreement**.  Except as otherwise expressly provided in this Agreement, the rights and obligations of the parties to this Agreement shall survive the termination of the Executive's employment with the Corporation.

22.  **Acknowledgment by Executive**.  The Executive represents to the Corporation that he is knowledgeable and sophisticated as to business matters, including the subject matter of this Agreement, that he has read this Agreement and that he understands its terms.  The Executive acknowledges that, before assenting to the terms of this Agreement, the Executive has been given a reasonable time to review it, to consult with counsel of choice, and to negotiate at arm's-length with the Corporation as to the contents.

23.  **Other Agreements and Modification**.  This Agreement may be amended or cancelled only by written mutual Agreement executed by the parties.  This Agreement constitutes the sole and complete Agreement between the Corporation and the Executive and supersedes all other agreements, both oral and written, between the Corporation and the Executive with respect to the matters contained herein; provided, however, that this Agreement does not supersede any Change in Control Agreement or Severance Plan, except as specifically addressed in this Agreement.  The parties acknowledge that other than what is contained in this Agreement, no verbal or other statements, inducements, or representations have been made to or relied upon by the Executive.  The parties each represent to the other that they have read and understand this Agreement.

24.  **Ambiguities**.  This Agreement has been negotiated at arms-length between persons knowledgeable in the matters dealt with herein.  In addition, each party has been represented by

-13-

experienced and knowledgeable legal counsel.    Accordingly, the parties agree that neither the Corporation nor the Executive is the drafting party and that any rule of law or any other statutes, legal decisions or common law principles of similar effect that require interpretation of any ambiguities in this Agreement against the party that has drafted it is of no application and is hereby expressly waived. The provisions of this Agreement shall be interpreted in a reasonable manner to give effect to the intentions of the parties hereto.

IN WITNESS WHEREOF, the Executive has hereunto set his or her hand, and the Corporation has caused these presents to be executed in its name and on its behalf, as of the date above first written.

RYERSON TULL, INC.

Dated: _____                                _____
                                                        William Korda
                                                        Vice President — Human Resources

Dated: 12-17-04                                         _____
                                                        Phillip M. Wylie
                                                        Vice President Mid-South Division

-14-

## RHOMBUS HOLDING CORPORATION
## 2009 PARTICIPATION PLAN

1.    **Purpose.** The purpose of the 2009 Participation Plan (the "Plan") is to provide incentive compensation to key employees of Rhombus Holding Corporation, a Delaware corporation (the "Company") and its subsidiaries. Such incentive compensation shall be based upon the award of Performance Units, the value of which is related to the appreciation in the value of the Company, and shall be payable to participants upon the occurrence of certain Qualifying Events. The Plan is also intended to benefit the Company by creating incentives for participating key employees.

2.    **Administration.** The Plan shall be administered by the Compensation Committee (the "Committee"), such committee to be appointed by the directors of the Company. Subject to the provisions of the Plan, the Committee shall have exclusive power to select the key employees to be granted Performance Units, to determine the number of Performance Units to be granted to each key employee selected, to determine the time or times when Performance Units will be granted, and to determine the value of Performance Units at the time of grant (the "Grant Value"). The Committee shall have sole authority to interpret the Plan, to adopt and revise rules and regulations relating to the Plan, to determine the conditions, not inconsistent with the Plan, subject to which any awards may be made or payable, and to make any other determinations that it believes necessary or advisable for the administration of the Plan. Determinations by the Committee shall be made by majority vote and shall be made in its sole discretion and shall be final and binding on all Participants.

3.    **Grants.** Performance Units shall be granted to such key employees of the Company and its subsidiaries, as the Committee shall determine, who shall hereafter be referred to as "Participants." Performance Units shall be granted at such time or times and shall be subject to such terms and conditions, in addition to the terms and conditions set forth in the Plan, as the Committee shall determine. Such additional terms and conditions shall be set forth in the Grant Agreement (the "Grant").

4.    **Performance Units.**

4.1    **Grant of Performance Units.** Performance Units granted to a Participant shall be credited to a Performance Unit Account (the "Account") established and maintained for such Participant. The Account of a Participant shall be the record of Performance Units granted to him under the Plan, is solely for accounting purposes, and shall not require a segregation of any Company assets. The grant of Performance Units under the Plan and the Grant Value of such Performance Units shall be set forth in the Grant.

4.2    **Number of Performance Units.** The maximum number of Performance Units that may be awarded under the Plan is 87,500,000 (the "Maximum Performance Units"), subject to increase pursuant to Section 4.3.

4.3    **Increase of Performance Units.** The Maximum Performance Units may be increased by the Committee at any time, in its sole discretion:

4.3.1    If the Company, directly or indirectly, completes an acquisition (the "Acquisition"), in which event the number of additional Performance Units that may be issued will be equal to the product of: (x) the Maximum Performance Units on the applicable Signing Date (hereinafter defined), times (y) the sum of (a) one plus (b) that percentage equal to: (i) the latest trailing twelve (12) calendar month EBITDA (hereinafter defined) generated by the Acquisition in question, divided by (ii) the Company's then latest trailing twelve (12) calendar month EBITDA (each of (i) and (ii) measured on the date the relevant acquisition agreement is executed (the "Signing Date")); provided, however that the Committee may elect, in lieu of using the trailing twelve (12) calendar month EBITDA figures described in this Section 4.3.1, to use instead the EBITDA figures that correspond to the twelve (12) month period that ends upon the last day of the calendar quarter either prior to or subsequent to the Signing Date. As used in this Section 4.3.1,

Px3

"EBITDA" means consolidated net income before interest, income taxes, depreciation and amortization and before the effect of LIFO gains or expenses.

    4.3.2   to permit the award(s) of Performance Units to employees of the Company or its subsidiaries by an amount not to exceed thirty (30%) percent of the Maximum Performance Units.

5.    <u>Maturity of Performance Units</u>.  Performance Units granted to a Participant shall mature according to the terms approved by the Committee as set forth in the Grant.

6.    <u>Payment for Performance Units</u>.

6.1    <u>Qualified Event Value; Net Value</u>.  Subject to the terms and conditions contained herein, upon the occurrence of a Qualifying Event (defined hereafter), each Participant shall be entitled to receive from the Company an amount, with respect to each matured Performance Unit in the Participant's Account, equal to: (i) the Qualified Event Value (as determined pursuant to Section 8 hereof) of each Performance Unit in the Participant's Account as of the date of the Qualifying Event, reduced by (ii) the Grant Value of each Performance Unit as set forth in the Grant. The sum of (i) reduced by (ii) is referred to as the "Net Value." In the event that the Net Value of a matured Performance Unit is zero or less, there shall be no payment to a Participant in connection with such Qualifying Event; provided, however, that the amount of such Net Value shall reduce the Grant Value of each matured Performance Unit (the "Adjusted Grant Value") in the Participant's Account and such Adjusted Grant Value shall be used in the calculation of the Qualified Event Value of matured Performance Units upon future Qualifying Events.

6.2    <u>Forfeiture</u>.  All Performance Units granted to a Participant, whether or not fully matured, will be forfeited, and the Company will have no further obligation hereunder to such Participant, if any of the following circumstances occur with respect to such Participant as determined by the Committee in its sole discretion:

    6.2.1   the Participant terminates or is terminated from his employment with the Company or one of its subsidiaries with or without cause; provided, however, that in the event of a Participant's death, payment of any amount then due under the Plan (or that, but for Participant's death, was matured and would otherwise have become due within six (6) months of Participant's death) shall be made to the duly appointed and qualified executor or other personal representative of the Participant to be distributed in accordance with the Participant's will or applicable intestacy law; or in the event that there shall be no such representative duly appointed and qualified within six (6) months after the date of death of such deceased Participant, then to such persons as, at the date of his death, would be entitled to share in the distribution of such deceased Participant's personal estate under the provisions of the applicable statute then in force governing the descent of intestate property, in the proportions specified in such statute;

    6.2.2   the Participant does not execute a two year non-competition agreement, in a form acceptable to the Committee, with the Company; or

    6.2.3   the Participant violates any agreement with the Company regarding the assignment of rights to the Company or the confidentiality of Company information.

6.3    Except as hereinafter provided, payment to a Participant of any amounts due under the Participation Plan shall be made either in a lump sum or in installments, payable at fixed or objectively determinable times and in fixed or objectively determinable amounts as determined by the Committee at the time of each Qualifying Event. In establishing the time of payments, the Committee may differentiate among Participants on any basis it deems appropriate.

6.4    In the event of a Qualifying Sale Event (as defined below) that involves consideration of publicly-traded stock, the Committee may, in its discretion, and in lieu of a cash payment to one or more Participants, elect to distribute shares of such stock to such Participant(s) in lieu of cash. In such event, the fair market value of the stock distributed in lieu of cash to such Participant(s) shall be determined by the Committee in its sole discretion. Such stock issued to Participant may

contain certain commercially standard or other reasonable restrictions, whether imposed by law or otherwise.

7.    Qualifying Event.    There shall be two categories of transactions, either of which may constitute a "Qualifying Event."

7.1    A "Qualifying Sale Event" shall be defined as a sale (whether effected directly or through a merger or similar transaction) of some or all of the common stock Company by Platinum Equity Capital Partners, L.P. or its affiliates (but excluding a sale of common stock by the Company); provided, however, that in no event shall a Qualifying Sale Event occur upon a sale to an affiliate of the Company.

7.2    A "Qualifying Distribution Event" shall be defined as a cash dividend by the Company to Platinum Equity Capital Partners, L.P. and its affiliated shareholders.

8.    Valuation of Performance Units

8.1.    Upon the Qualifying Event, the value of a Performance Unit will be an amount equal to the greater of (i) such amount as shall be determined, as of the applicable date, by the Committee in its sole discretion and (ii) the Qualified Event Value as of the applicable date, as determined pursuant to Section 8.2 below.

8.2    The Qualified Event Value shall be calculated by the Committee pursuant to one of the following methods:

8.2.1    In the event of a Qualifying Sale Event, the quotient of (A) the net purchase price as determined by the Committee in its sole discretion; divided by (B) the Total Units Outstanding.

8.2.2    In the event of a Qualifying Distribution, the quotient of (A) the amount of such dividend or distribution, net of any and all withholdings, divided by (B) the Total Units Outstanding.

As used herein, "Total Units Outstanding" is the number equal to ten times the Maximum Performance Units. In determining Qualified Event Value, the Committee shall take into consideration the transaction costs and expenses incurred by the Company and its affiliates in connection with a Qualifying Event, and may modify the calculations set forth in this Section 8.2 to reflect any capital or other contributions made to the Company (including those made in connection with any acquisitions made by or on behalf of the Company), to allow for the recapture of such contributions by the shareholders of the Company, or to reflect the repayment of any debt of the Company.

9.    Forfeiture of Performance Units on Termination of the Company.    If, at any time prior to a Qualifying Event, the Company ceases to engage in active trade and business, liquidates or dissolves or if the Company shall become insolvent or file for or have filed against it (and not dismissed within 60 days) a bankruptcy petition, then all Performance Units, whether or not fully matured, shall be forfeited and neither the Participants nor their heirs, personal representatives, successors or assigns shall have any further rights with respect to such Performance Units.

10.    Nontransferability.    Except as expressly set forth in this Plan, Performance Units granted hereunder, and any rights and privileges pertaining thereto, may not be transferred, assigned, pledged or hypothecated in any manner, by operation of law or otherwise, other than by will or by the laws of descent and distribution, and shall not be subject to execution, attachment or similar process.

11.    Withholding.    The Company shall have the right to deduct from amounts to be paid pursuant to the Plan any taxes required by law to be withheld with respect to such awards.

12.    Voting and Dividend Rights.    The Participant shall not be entitled, solely by reason of being a Participant under the Plan, to have any voting rights, to receive any distributions, or to have his Account credited or increased as a result of any distribution with respect to the equity interests of the

Ryerson Participation Plan
3-16-99

Company. No Participant is or shall be deemed to be a shareholder of the Company for any purpose whatsoever. Neither the Company nor the Committee have or shall have any fiduciary or similar duty to any Participant.

13. **Miscellaneous Provisions.** No employee or other person shall have any claim or right to be granted a Performance Unit under the Plan. Neither the Plan nor any action taken hereunder shall be construed as creating or implying the creation of a contract of employment between any employee and the Company or any of its affiliates, or giving any employee any right to be retained in the employ of the Company. The Plan shall at all times be entirely unfunded and no provision shall at any time be made with respect to segregating assets of the Company for payment of any benefits hereunder. No Participant or other person shall have any interest in any particular assets of the Company by reason of the right to receive a benefit under the Plan and any such Participant or other person shall have only the rights of a general unsecured creditor of the Company with respect to any rights under the Plan. Except when otherwise required by the context, any masculine terminology in this document shall include the feminine, and any singular terminology shall include the plural.

14. **Amendment of the Plan.** The Committee may alter or amend the Plan from time to time without obtaining the approval of the Participants.

15. **Effectiveness and Term of Plan.** The effective date of the Plan shall be February 16, 2009. The Committee may at any time terminate the Plan and unless sooner terminated by the Committee, the Plan shall expire on February 15, 2014. Any payments due a Participant with respect to a Qualifying Event that occurs prior to termination shall continue to be made, notwithstanding the termination of the Plan. All Performance Units shall terminate upon termination or expiration of the Plan.

9|7|09

Grant # 6

RHOMBUS HOLDING CORPORATION
2009 PARTICIPATION PLAN
GRANT AGREEMENT

Name of Participant: Phil Wylie

Rhombus Holding Corporation (the "Company") hereby grants to the person named above (the "Participant") Performance Units under and subject to the terms and conditions of the Company's Participation Plan, dated February 16, 2009 (as amended from time to time, the "Plan"), a copy of which has been provided to the Participant, upon the following terms and conditions:

| | |
|---|---|
| Number of Performance Units: | 6,562,500 |
| Date of Grant: | February 16, 2009 |
| Grant Value of Performance Unit: | US$1.00 |

Maturity of Performance Units:

   as of the date hereof, 1,640,625 Performance Units have matured;
   on October 31, 2009, 1,640,625 additional Performance Units shall mature;
   on October 31, 2010, 1,640,625 additional Performance Units shall mature; and
   on October 31, 2011, 1,640,625 additional Performance Units shall mature.

Payment shall be made only as to Performance Units that have matured under the above schedule and only after a Qualifying Event; provided, however, in the event of a Qualifying Event that involves all or substantially all of the stock or assets of the Company, all of the Performance Units granted hereunder shall be fully matured as of the date of such Qualifying Event.

By acceptance of this Grant, the Participant agrees to the terms and conditions hereof and the terms and conditions of the Plan

RHOMBUS HOLDING CORPORATION

By: _____
  Eva M. Kalawski
  Vice President and Secretary

Accepted:

(Sign) _____

(Date) 4-7-09

Rhombus Grant Agreement

Px 4

2|28|14

# General
# Separation and Release
# Agreement

### *Instructions for Completing Agreement*

**Purpose:**
The Ryerson Severance Pay Plan provides for the payment of severance pay and continuation of certain benefits when termination occurs due to a release from employment. In order to receive such payments and benefit continuation, you must be eligible as described in the plan and you must sign and return to the company the enclosed General Separation and Release Agreement.

**Review Period:**
You are allowed forty-five (45) days from the presentation date (date agreement is given to you) to review the document, seek legal advice and make your decision about signing and returning the document to the company. Be sure to carefully review all the details before deciding whether to sign the agreement.

**Execution of Agreement:**
If you desire to execute the agreement you must do so before the forty-five (45) day review period expires. To execute the agreement, sign on page 6, insert the date that you decide to enter into the agreement in the space provided on page 6 below your signature and return the agreement to Mike Anderson, Director of Compensation & Benefits, in the Ryerson corporate Human Resources Department. The agreement is enforceable on the 8th day after the agreement is signed by you and Ryerson. Please keep a copy of the agreement for your records.

**Revocation Period:**
Federal law allows that you have seven (7) days from the date that you execute the agreement to revoke your decision and declare the agreement to be null and void. If you reside in the state of Minnesota, your revocation period is fifteen (15) days.

**Human Resources**

*Separation and Release Agreement- Over 40/Group*
*Revised 04/2012*
*Page 1*



## GENERAL SEPARATION AND RELEASE AGREEMENT

This Separation and Release Agreement ("Agreement") is entered into by and between Ryerson Inc., on behalf of itself and its related and affiliated entities ("Employer") and Phillip M. Wylie ("Employee"), on behalf of himself/herself, his/her heirs and assigns:

**WHEREAS**, Employee's employment with Employer ends effective on or about January 8, 2014 ("Separation Date");

**WHEREAS**, the Employee is entitled to certain benefits under the Ryerson Severance Plan provided the Employee signs an appropriate release of claims.

**WHEREAS**, the Employer has offered to provide certain other benefits to Employee provided the Employee signs an appropriate release of claims.

**WHEREAS**, it is the Employee's desire to accept the benefits and remuneration provided to the Employee under the Ryerson Severance Plan and otherwise and in consideration thereof to sign an appropriate release of claims.

**NOW, THEREFORE, IT IS HEREBY AGREED** by and between Employer and Employee as follows:

1. Conditioned upon Employee's compliance with the terms of this Agreement, and in full and final satisfaction of all claims by Employee against Employer and the Released Parties (as defined below):

    (A)    Subject to Employee meeting the eligibility requirements and all other terms of the "Ryerson Severance Pay Plan," Employer shall pay Employee a payment equal to forty (40) weeks of regular pay, based on Employee's base monthly salary in effect on the Separation Date. The gross amount of this payment is estimated to be $223,615.38 based on Employee's current base pay rate. Withholdings required by law will be withheld from this payment. This amount is payable in the next full pay period following the later of the Separation Date or the expiration of the Revocation Period as described in 6(E) of this agreement.

    (B)    Any benefits for which Employee may be eligible are determined in accordance with the terms and conditions of the Employment Agreement between the parties.

    (C)    Employer will provide a payment in the gross amount of $15,000 in lieu of providing outplacement assistance to Employee.

The foregoing payments and benefits represent all of the compensation and benefits to which Employee is entitled by virtue of his/her employment and separation from employment with the Employer, plus additional compensation to which Employee is not otherwise entitled.

2.    The continuation and/or conversion privileges which are available to former employees under the law (i.e. COBRA) and the terms of the Employer's employee benefit plans ("plans") shall be available to Employee as of the Separation Date and must be exercised by Employee, if at all, within the time period established by law and the plans as measured from that date.

3.    Employee agrees that (except pursuant to judicial legal process or any legal action to enforce this Agreement), Employee shall keep confidential the terms of this Agreement, and all performance hereunder and shall not disclose this information henceforth to anyone other than the Employee's family, attorney and tax advisors, who also shall be bound by this confidentiality obligation. Further, Employee shall not at any time hereafter disparage or portray in a negative light Employer and shall not disclose to anyone any information regarding the Employer that is non-public, confidential, or proprietary.

Employee agrees to cooperate with Employer in the truthful and honest prosecution and/or defense of any claim in which the Released Parties (as defined below) may have an interest (subject to reasonable limitations concerning time and place), which may include without limitation (subject to the payment of reasonable out-of-pocket expenses incurred by Employee and, in the case of extraordinary expenses, only at Employer's prior and specific request) making himself/herself available to participate in any proceeding involving any of the Released Parties, allowing himself/herself to be interviewed by representatives of Employer, participating as requested in interviews and/or preparation by any of the Released Parties of other witnesses, appearing for depositions and testimony without requiring a subpoena, and producing and/or providing any documents or names of other persons with relevant information.

4.    Employee represents that he/she has returned to Employer (or will immediately return to Employer no later than his/her Separation Date) all company provided equipment and material such as laptop computers; printers; cell phones; Employer's forms, papers, books, records, computer diskettes, computer programs; any written, printed or electronic media or materials provided by Employer and in Employee's possession or control, and all copies thereof; and all other property of Employer or the Released Parties. The Employer shall retain exclusive ownership rights to all such materials.

5.    Employee agrees that neither this Agreement nor performance hereunder constitutes an admission by the Employer of any violation of any Employer policy, federal, state or local law, regulation, common law, or any breach of any contract or any other wrongdoing of any type.

6.    Except for a claim based upon a breach of this Agreement and/or any claim for benefits under the employee's state of residence Workers Compensation Act, Employee hereby

releases the Released Parties (as defined below) from any and all claims, suits, demands, actions or causes of action of any kind or nature whatsoever, whether the underlying facts are known or unknown, which Employee has or now claims, or might have or claim, pertaining to or arising out of Employee's employment by Employer or his/her separation from employment with Employer, including Employee's right to be a representative or a member of any class in class claims or class litigation against the Released Parties. This release covers all claims of any kind under any Employer policy, local, state, or federal common law, statute, regulation or ordinance, including without limitation those claims dealing with employment discrimination, including, without limitation, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., 42 U.S.C. § 1981, the Age Discrimination in Employment Act, as modified by the Older Workers Benefit Protection Act, the Civil Rights Act of 1991, the Americans with Disabilities Act, claims under the Family and Medical Leave Act, claims under the Workers Adjustment and Retraining Act or for breach of contract for misrepresentation, for defamation, for wrongful discharge under the common law of any state, for infliction of emotional distress or for any other tort under the common law of any state. This release shall run to and be for the benefit of Employer and each of its affiliated or related entities, and all predecessors, successors and assigns thereof and each of their trustees, shareholders, directors, officers, employees, contractors, agents and attorneys, past or present, and all predecessors, successors, heirs and assigns thereof (collectively "Released Parties"). This release shall run to and be binding upon Employee and his/her heirs and assigns. Employee acknowledges and agrees that this release and the covenant not to sue set forth in Paragraph 7 are essential and material terms of this Agreement and that, without such release and covenant not to sue, no agreement would have been reached by the parties. Employee understands and acknowledges the significance and consequences of this release and this Agreement.

The following provisions are applicable to and made a part of this Agreement and the foregoing general release and waiver:

(A)    Employee releases and waives all rights and claims that he/she may have under the Age Discrimination in Employment Act, as amended by the Older Workers Benefits Protection Act, which arose prior to the execution of this Agreement and not claims under that Act which arise after the execution of this Agreement.

(B)    Employee hereby acknowledges that in exchange for this general release and waiver hereunder he/she has received separate consideration beyond that to which he/she is otherwise entitled under Employer policy or applicable law.

(C)    EMPLOYER HAS ADVISED AND HEREBY EXPRESSLY ADVISES EMPLOYEE TO CONSULT WITH AN ATTORNEY OF HIS/HER CHOOSING PRIOR TO EXECUTING THIS AGREEMENT WHICH CONTAINS A GENERAL RELEASE AND WAIVER.

(D)    Employee has forty-five (45) days from the date of presentment to consider whether or not to execute this Agreement.

*Separation and Release Agreement- Over 40/Group*
*Revised 04/2012*
*Page 4*

(E)     If Employee executes this Agreement, Employee has a further period of seven (7) days (or 15 days in Minnesota, as applicable) after such date in which to revoke the Agreement (by written revocation delivered to the company representative whose signature is affixed to this agreement, by 5:00 p.m. on the seventh day after execution occurred) (the "Revocation Period") and the Agreement shall not become effective or enforceable until the day after the Revocation Period expires ("Effective Date"); provided, however, that if Employee does not execute or executes and later timely revokes this Agreement, then Employee will not receive the payments and benefits described in Paragraph 2 above (except accrued and unused vacation pay, the vested benefits listed above, and COBRA insurance continuation rights).

(F)     By this Agreement Employee understands that his/her termination is part of an Employment Termination Program. Eligibility factors for the program include: consolidation of job functions, elimination of redundant job functions, job performance (in some cases), skills sets and the ability to handle job functions outside of current duties. Different factors, alone or in combination, may have played a role in each of the Company's decisions. By this Agreement, the Employee also understands that the Employment Termination Program covers employees in Southwest Region Office, of the Employer and that the Employment Termination Program is on going.

(G)     Attached to this Agreement for review by the Employee is 1) a list by job title and age of employee, of all employees, who as of January 8, 2014, were selected for termination, and 2) a list, by job title and age of employee, of all employees, who as of January 8, 2014, were *not* selected for termination.

7.     To the maximum extent permitted by law, Employee covenants not to sue or to institute or cause to be instituted any kind of claim or action (except to enforce this Agreement) in any federal, state or local agency or court against any of the Released Parties arising out of the matters covered in the prior paragraph.

8.     This instrument constitutes the entire agreement between the parties. No modification of this Agreement shall be valid unless signed by the party against whom such modification is sought to be enforced.

9.     If any provision, section, subsection or other portion of this Agreement shall be determined by any court of competent jurisdiction to be invalid, illegal or unenforceable in whole or in part, and such determination shall become final, such provision or portion shall be deemed to be severed or limited, but only to the extent required to render the remaining provisions and portions of this Agreement enforceable. This Agreement as thus amended shall be enforced so as to give effect of the intention of the parties insofar as that is possible. In addition, the parties

hereby expressly empower a court of competent jurisdiction to modify any term or provision of this Agreement to the extent necessary to comply with existing law and to enforce this Agreement as modified.

10.    This Agreement shall be construed in accordance with the laws of the State of Illinois. Employee hereby submits to the jurisdiction of any court sitting in the State of Illinois for the purpose of any lawsuit concerning the construction or enforcement of this Agreement and further agrees he/she will not seek to have the lawsuit removed or transferred to any other forum.

11.    Employee warrants and represents that he/she has not filed or suffered to be filed on his/her behalf any claim, action, demand or other matter of any kind covered by the above release or covenant not to sue as of the date and time of the execution of this Agreement, with the sole exception of his/her claim for unemployment benefits. Employee also warrants and represents that he/she has no other or further claims under any statute or common law against the Released Parties.

12.    *Employee acknowledges that he/she has read this Agreement, that he/she fully understands and appreciates the meaning of this Agreement, that it fully reflects the entirety of the agreement between the parties, that no representation, inducement, or warranty has been made to him/her by or on behalf of Employer except as set forth herein, that he/she has had the opportunity to consult legal counsel of his/her selection, and that he/she KNOWINGLY and VOLUNTARILY enters into this Agreement and agrees to comply with its terms and conditions.*

FOR RYERSON INC.

By: _____

Title: _A S S T .   S E C R E T A R Y_

Presented by: _____

Presentation Date: _2/28/2014_

EMPLOYEE

_____
Employee Signature

_2 - 28 - 2014_
Execution Date

Phillip M Wylie

13701 Colonel Glenn Road

Little Rock, AR  72210

January 13, 2014

Mr. Mike Arnold

President and CEO

Ryerson, Inc

227 West Monroe

Suite 2700

Chicago, IL  60606

Dear Mike,

I have had the time and opportunity to think deeply about my career with Ryerson and the previously acquired companies I have worked for continuously since December of 1987.  This is excluding the 13 years with AFCO Metals prior to a service interruption that ended in April of 1981.

My reflection started in earnest when you abruptly elected to put me on Short Term Disability within a few days of learning that I had Lymphoma of the Brain.  I was diagnosed on July 17, started treatment on July 25 and short term disability was effective on July 30.



You may not be aware but there have been instances over the years when managers and executives at Ryerson developed what proved to be terminal cancer.  They were given the opportunity to continue working as best they could as long as they could without being pushed aside as you were in such a hurry to do to me.   Remember Mike, you shared information with Sara and me on the phone about how well you were treated at Timken when you had a serious medical issue?  Apparently you didn't see me as worthy of such respectful treatment.

You said that I needed to devote all my energy to recovery.  In fact you had no idea of my work capability.   Your actions as I recovered proved what you were really interested in.

Roger Lindsay assured Sara and me on July 30 (no doubt at your instruction) that the Participation Plan would be rewritten (to address an IPO scenario, new dates and so forth) as it expired in February 2014 and that "you will be included in it".  Your statement to me on the January 5, 2014 conference call was, quote "it is a Platinum Equity program" it's "discretionary",  you "must be an employee to participate and you will no longer be an employee".  Tying that statement with your decision to terminate me points to you as the source of the "discretion".

When I phoned you to report that I would make a full recovery (after only two treatments) on September 6 you expressed that was good news and quote "you sure are a tough old goat", but

2

your underlying thought process was in retrospect must have been--I've got to move fast.

To review, on Wednesday Sep 8, Kevin Richardson called me and said he needed to come see me. I pressed Kevin on why and he said you had decided to shut down the Southwest Region and had asked him to come to Little Rock (by the way Mike, I was your direct report, not Kevin's). No real surprise you had Kevin come since you never came to Little Rock to visit me (the January 2012 performance appraisal conversation during the Talent Review meeting) is our only in person one on one conversation other than while picking you up at various airports. This is for the complete period I reported to you.

You did ultimately call me an hour or so before Kevin arrived on Thursday, but of course told me "you are on short term disability, we will speak to you when you return to work". This just confirms the convenience of your choice to put me on Disability avoiding any communication with me while you implemented your scheme.

Regardless of any of this, I've received my written notification of separation from Ryerson effective Jan 8.

It is important that you understand that I am not inclined to sign a release and walk away from the potential benefit of the Participation Plan. I have told you more than once that I intended to continue working for a few more years, especially until a transaction took place triggering a reward under the Plan.

The Plan was put in place several years before your arrival at Ryerson. However I don't dispute your discretion in removing me from my position. Under the circumstances of my track record including success with managing acquisitions, developing Mexico, finally turning the West around , to name a few, there is no justification for your action.

As you must be aware, since the purchase of Ryerson by Platinum Equity I (and others) have endured elimination of benefits (company provided car and club memberships). I have willingly taken these personal financial hits in support of the goal of making Ryerson a stronger performer and have looked to receive a financial reward for the sacrifices.

Considering my age and health circumstances it is even more patently wrong and totally unacceptable to me. Ironically your action has come as you are ever closer to taking the company public.

I expect a response to this letter not later than January 24, 2014.


Respectfully,



Phillip M Wylie

4

January 23, 2014

Mr. Phillip M. Wylie
13701 Colonel Glenn Road
Little Rock, AR 72210

Dear Phil:

I received your letter dated January 13, 2014 and I'm sorry that you feel you have been poorly treated in connection with your separation from the company. It was certainly not our intent.

The planning process to eliminate the Southwest regional structure began in early 2013. The implementation was delayed with the re-filing of an S-1 for a possible IPO in Q2, and then in respect of your health situation.

It is certainly your choice not to sign the release that was sent to you with your notice of separation. Please note, however, that by not signing the release, you are forfeiting any payments and other benefits that you would otherwise receive under Ryerson's severance policy. Please also note that your participation in the Ryerson Participation Plan ended as of the effective date of your termination (this is true regardless of whether you sign the release).

Sincerely,

Mike Arnold
President & Chief Executive Officer

Px 7

rmmunications
bruary 23, 2017 8:21 AM
unications
e from Eddie Lehner

<image003.jpg>

Dear Colleagues,

It is with great sorrow that I share news of Phil Wylie's passing. As Ryerson's former Southwest region president, Phil was a dedicated mentor and leader, serving the company for nearly 40 years with AFCO Metals and later Ryerson before his retirement in 2013.

I had the opportunity to see and spend time with Phil most recently in 2015 in Little Rock with Kevin Richardson and Dan Boone and afterward in conversation by phone. It is with a heavy heart I can say this man will be missed. Phil was as decent and honest as they come in this world. He believed strongly in conducting business with integrity and high character and it showed in the many relationships he cultivated and built throughout his life. Phil was widely respected in the metals industry and was instrumental in helping Ryerson navigate the early phases of its ongoing transformation championing the company's expansion into Mexico and the acquisitions of Texas Steel Processing, Inc. and SFI-Gray Steel.

On top of his legacy at Ryerson, Phil was also a devoted husband and father. He is survived by his wife Sara and two children, Brooke and Michael.

Please join me in keeping Phil and his family in our thoughts as we honor his life as a husband, father, friend and colleague.

With deepest sympathies,

<image006.jpg>
President and Chief Executive Officer
Ryerson

This message contains confidential information and is intended only for the individuals to whom it is addressed. You should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.


Px8